[No. B033751. Second Dist., Div. Seven. Oct. 9, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ANTHONY VON VILLAS et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. All of the opinion is to be published with the exception of III (C).

**COUNSEL**

Russell Iungerich and Mark D. Greenberg, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Marc E. Turchin and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FLYNN, J.*—

I

PROCEDURAL BACKGROUND

Robert Anthony Von Villas and Richard Herman Ford were charged in a 16-count information filed on October 14, 1986. For convenience, the information shall be considered as charging three separate sets of counts: The Loguercio conspiracy to commit murder counts; the Schaffer & Sons jewelry store robbery counts; and the Weed murder counts. The third set of counts involving the murder of Thomas Weed was severed from the information and tried separately. This opinion relates only to the first two sets of counts.

A. *The Loguercio Conspiracy and Attempted Murder Counts*

Both defendants were convicted by jury of conspiracy to commit murder (Pen. Code, §§ 182/187 [all statutory references are to the Penal Code unless otherwise indicated]). The charge contained 31 overt acts and named Joan Loguercio as the target. They were also convicted of the attempted murder of Ms. Loguercio on June 17, 1983, as well as on July 7, 1983 (§§ 664/187). Charges that a principal was armed with a firearm were found to be true as to both defendants. (§ 12022, subd. (a).)

Von Villas was acquitted of a charge that he attempted to administer stupefying drugs in committing the attempted murder of Ms. Loguercio (§ 222), while Ford was convicted of that charge.

B. *The Schaffer & Sons Robbery Counts*

Sue Martin, Theresa McKinney and Marilyn Lance Klass, employees of Schaffer & Sons jewelry store, were victims of the three robbery charges for

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

which both defendants were convicted (§ 211). The defendants were also convicted of conspiracy to commit the robberies (§§ 182/211) and the special allegations that a principal was armed during the three robberies were found true (§ 12022, subd. (a)). Ford was found to have personally used a firearm (§ 12022.5). The jury found both defendants took property worth more than $100,000 (§ 12022.6). Both defendants were also convicted of felony false imprisonment charges as to each of the three victims (§ 236). As to the false imprisonment charges, the jury found that both defendants took funds and property worth more than $100,000; that a principal was armed with a firearm (§ 12022, subd. (a)), and that Ford personally used a firearm (§ 12022.5). Finally, the jury found both defendants had committed assaults with a firearm (§ 245, subd. (a)(2)) as to the three victims, and, again, that the property taken during the assaults was of a value exceeding $100,000.

### C. *Sentencing*

Von Villas was sentenced to a term of 35 years to life, while Ford received 36 years to life. They appeal from their convictions below.

## II

### FACTS

### A. *The Robbery of the Schaffer & Sons Jewelry Store*

On Monday, November 22, 1982, at approximately 8:45 p.m., manager Sue Martin, assistant manager Marilyn Lance (née Klass), and merchandise coordinator Theresa McKinney were preparing to close the Northridge Mall branch of Schaffer & Sons, a jewelry store. A man entered, placed a black brief case on the counter, retrieved a handgun from it, and pointed it at the three women. He forcefully herded them into the restroom and, after warning them that he was going to tie them up, stated, "Hands behind your back, palms together." By this time Ms. Martin realized she had dropped her key ring which contained means of access to the safe room as well as the jewelry counters.

The bandit told all the women that his partner had a police band radio that would notify them in advance if any of the women pushed an alarm. He closed the door and, for the next 20 minutes, the women heard scuffling or rattling in the shop. The intruder then opened the door, said, "O.K., Ladies?," and shut the door.

None of the women saw the alleged accomplice.

Upon reentering the store, the women noticed that it appeared closed for the evening, with the display cases covered with their usual blue or white drapes and the front accordion door pulled closed. Ms. Martin's key ring could not be found, and the door to the safe room was open. This was unusual, since it was closed and locked during business hours. Metal containers which had stored loose diamonds in individual diamond papers or bindles were empty, and the money which Ms. McKinney was counting was missing. Many trays had been dropped, and a number of finished pieces of jewelry, including ladies' fashion rings and mountings, were gone. Brass mountings, on display as samples, were also missing. The entire inventory of loose diamonds could not be found. The police arrived later that evening to take reports.

The bandit, later identified as Ford, wore a dark overcoat, appeared to be in his late 40's, was of large frame, and stood about 6 feet tall. He appeared to be wearing a full artificial beard which was very neatly trimmed and "salt-and-pepper" in color. His hair also appeared not to be real because it, like the beard, was too well trimmed and too cleanly lined. His ruddy complexion was medium and of uneven texture. During the robberies, he was wearing flesh-colored surgical gloves.

Marie Chodkowski, with her daughter Michele, had parked their car at the Northridge Mall at approximately 7:30 p.m. on the evening of the robbery. After shopping, they returned to the car at approximately 8:55 p.m. and noticed two men, later identified as Von Villas and Ford, standing in a parking area. Ms. Chodkowski thought Von Villas and Ford were made up like movie characters, and noticed that both looked away as she and her daughter approached. After placing their packages in the car, Ms. Chodkowski and her daughter observed that Ford, the bearded man in the dark overcoat carrying a black briefcase, was gone, and that Von Villas, also bearded and mustachioed and wearing a tan overcoat, was entering the mall. Ms. Chodkowski felt it strange that these men would enter the mall at closing time. She and her daughter decided to follow them. They observed Von Villas enter the Schaffer & Sons store and close its accordion doors as he removed his tan overcoat. They could not see into the store, but continued to observe, as they notified someone to contact security. After three security guards appeared and departed, Ms. Chodkowski and her daughter observed Ford and Von Villas, wearing their respective overcoats, with Ford carrying the black briefcase, leave the store. Ford pulled the doors closed as he left. Von Villas was observed to peel off a pair of what appeared to be surgical gloves and place them in his pocket. The two headed toward the parking area. The Chodkowskis then went home and called the police to report what they thought was a robbery.

Mr. Castro, one of the three security guards who appeared at the jewelry store, observed that the accordion door was not closed, and that a White male, matching Chodkowski's description of Von Villas, was in the store covering the display counters. Mr. Castro was asked by the male if there was anything he could do for him, to which Mr. Castro replied "no." Mr. Castro detected nothing unusual in the store.

Mr. Laguna, one of the three security guards, also observed two men in the jewelry store conducting themselves as though they were employees closing the store. They were removing jewelry from the display cases, but Mr. Laguna could not see where they were taking it. Assuming all was well, in spite of the fact that he had never seen the two men before, he left to complete his rounds.

With respect to the opinions of several witnesses that Ford and Von Villas wore wigs and other disguises on the evening of the jewelry store robbery, the prosecution called Mr. Robert Fuller, an actor and an acquaintance of Von Villas's. Sometime during October of 1982, shortly before the robbery, Von Villas telephoned Fuller and told him he, Von Villas, was going under-cover and needed a makeup man who could provide a disguise. Mr. Fuller referred Von Villas to Mr. Jack Stone, a makeup man with significant experience. Mr. Stone then contacted Darlis Chefalo, an expert wig designer, and advised her that he needed wigs made for two undercover federal narcotics officers. She agreed to accept the job, and Mr. Stone accompanied Von Villas and Ford to her house where they were introduced as Dick and Bob. She arranged to purchase wigs for them, while Mr. Stone acquired beards and moustaches. The wigs were treated so as to make Von Villas and Ford appear older by use of a salt-and-pepper appearance. In working to perfect the disguise, Ms. Chefalo applied dark makeup on both men three times, the last time being on November 18, 1982. Extra makeup was provided, so the men could create the disguises themselves. She had sug-gested to them that Mr. Lotito, a true makeup expert, would be more skilled in changing their appearances, but Von Villas refused to let anyone but Ms. Chefalo do the makeup. As they left her house on November 18th, Von Villas and Ford told her to forget she had ever seen them.

Although there were difficulties encountered by Schaffer & Son employ-ees in presenting an accurate inventory of each item taken during the robbery, Ms. Martin had taken inventory on October 19, 1982. One of the diamond parcel papers or "bindles" in that inventory was marked N.R.M. 200B45. The same parcel was in inventory on November 9, 1982. N.R.M. meant North Ridge Memo, an indication that the stones contained therein were a part of that store's inventory as opposed to other branches of Schaffer

& Sons. The diamond parcel containing the identifying notes would be removed from the diamonds when they were sold, and a clean parcel would be provided. Two hundred thirty-nine diamonds were taken from the store during the November 22, 1982, robbery. Their wholesale value was $62,361, and the retail value was twice that. In addition, certain brass rings used for samples when customers wished to purchase gold rings of the same design were taken during the robbery.

Many of the loose diamonds taken during the robbery were similar to those either traded by Von Villas for other goods or services or to those found in his home during execution of a search warrant on July 8, 1983. The bindle containing the marking N.R.M. 200B45 was also recovered during the execution of the warrant, but was inadvertently lost while in police custody. Other bindles and a brass ring, created by a jewelry designer who provided similar rings of this nature to Schaffer & Sons, were also recovered during the search.

Both Von Villas and Ford were active duty officers of the Los Angeles Police Department (LAPD), assigned to the Devonshire Division on the date of the robbery. At one time Von Villas had been assigned to the one-person substation at Northridge Mall, which was run by Officer Jim Dellinger at the time of the robbery. Thus Von Villas probably knew that the substation was unmanned on November 22, 1982. Northridge Mall was within the jurisdiction of Devonshire Division.

LAPD Detective Roger Dunn, an expert in undercover narcotics operations, opined that it was not the practice of LAPD to use officers disguised with makeup and beards in undercover narcotics investigations because the disguises could come off or be disturbed in the midst of the investigation.

LAPD Detective William Gailey, a classmate of Ford's in the training program at LAPD, indicated that part of their training was to use proper handcuffing techniques, which included use of the command, "Hands behind your back, palms together." Officer Tortorici, who worked with Ford for about a year, observed Ford handcuff several dozen people and heard him say, on many occasions, "Hands behind your back, palms together."

Von Villas and his then partner Officer Glenn Bedford worked together on November 22, 1982. They routinely used "rovers" or "walkie talkies" that were checked out from the Devonshire Division's equipment room. Von Villas was assigned Rover 3457 that day. Both Rover 3457 and 3453 were logged as missing after Von Villas's shift concluded at 4:45 p.m. Rover 3456, assigned to Officer Bedford, was returned on time. Rover 3453 had

been assigned to the Northridge Mall substation. Some time before the evening of November 23, 1982, Rover 3457 reappeared in the equipment room.

Ms. Diane Withers, a high school classmate of Von Villas, met him at a restaurant in Redondo Beach with other classmates in December, 1982. Von Villas told Ms. Withers that he could get some very good diamonds at half price. He said he could get a $10,000 stone for only $5,000. He also told Russell Kafel, another participant in the gathering, that if anyone was interested in diamonds, he could get them a good deal.

Von Villas, sometime between December 1 and December 24, 1982, approached Mrs. Elaine Neveaux, a nurse at Northridge Hospital. Away from his LAPD partner, he told Mrs. Neveaux and others that he had diamonds to sell. Mrs. Neveaux, who had known Von Villas for 10 years through her ex-husband, an LAPD officer, was familiar with the value of diamonds. She thought the prices quoted by Von Villas were considerably lower than retail.

Von Villas had been a customer of Schaffer & Sons for several years prior to the robbery. After the robbery, he made several contacts with other jewelers and business persons in an effort to sell loose diamonds to them or barter them in trade for other items, such as automotive repair equipment, tools and furniture. Many times he was successful.

In addition to the many stones and pieces of jewelry seized during the search of Von Villas's residence, police officers recovered a pair of surgical gloves in a boot in the master bedroom and a small revolver under the bed.

Ford's residence was searched on July 8 and 15, 1983. These searches led to the discovery of the overcoat worn during the robbery, the hairpiece used as a disguise, and makeup materials, including a container of pancake materials labeled with the name "Stone." Several weapons were also recovered.

Early in 1983 Von Villas visited Bill Justice Custom Jewelry to have what he believed was a pure gold ring sized and used as a mounting for some loose diamonds. Connie Baisley, a jeweler working for Bill Justice, cut into the ring and found it to be brass. Von Villas was notified of this, and thereafter had a mold made of the brass ring so that gold rings could be produced. He and Ford both purchased gold rings made from the mold. The brass ring provided by Von Villas was one of the brass rings taken during the Schaffer & Sons robbery.

Ford also actively attempted to trade loose diamonds on March 2, 1983.

In January 1983, both Von Villas and Ford admitted committing the Northridge Schaffer & Sons jewelry store robbery to Bruce Adams. Both Von Villas and Ford threatened to kill Mr. Adams if he ever revealed anything about the jewelry store robbery.

B. *The Loguercio Conspiracy and Attempted Murders*

Von Villas had conducted business with a mortgage broker, Gayl West, on several occasions. She had, through M.B. Financial, arranged to finance certain real estate transactions brought to her by Von Villas in the past. She met with Von Villas in January 1983, at a Marie Callender's restaurant in Northridge, to discuss a real estate loan. At the conclusion of the meeting he told her that if she knew anyone who wanted a contract put on anybody, to let him know. He said they could both make a commission on such an arrangement. Ms. West became concerned, because Von Villas was not joking. At this time, Von Villas mentioned he had a friend, Joan Loguercio, recently divorced, who needed an appraisal of her home to enable her and her husband to split the profits. Although Ms. West was shocked by Von Villas's comment about putting out contracts on people, she did arrange to have Russell Cartwright conduct the Loguercio appraisal.

Von Villas had contact with Ms. West sometime between January and April, 1983, when he was assisting Linda Sintic, a friend, with a real estate loan. During the negotiations, Von Villas told Ms. West he would supply diamonds as security for the loan. When asked where he had obtained the diamonds, he said it was none of her business.

Marilyn Petretti met Von Villas in May of 1983 and saw him socially from May to July. During that period she saw him with loose diamonds in his possession. Von Villas complained to her about his inadequate salary, and said he could have people killed if he felt they were doing the wrong thing. He claimed to know many people with whom he could arrange another's death.

Joan Loguercio met Von Villas in March 1982, when she reported to the Devonshire station that her son had run away. Von Villas came out to talk to her about it, and they became friends. He wanted to help with her divorce and home loan problems. Eventually, Ms. Loguercio agreed to a "paper sale" through which Von Villas would buy her home, while she continued to live in the house. This would enable Von Villas to qualify for a loan on Ms. Loguercio's house. An arrangement was made whereby Von Villas would

acquire a life insurance policy covering each of them, Von Villas and Ms. Loguercio, so that the survivor would receive $100,000. The ostensible purpose of the policy was to cover the mortgage payments on Ms. Loguercio's home. On May 20, 1983, Ms. Loguercio signed an insurance document and she submitted to a medical examination on May 23, 1983. The plan for Von Villas to acquire a loan on the Loguercio house never materialized, but an Allstate term policy, as described, was issued; it was picked up by Von Villas. He paid the premiums on May 20, 1983.

Von Villas was incorrectly advised by the insurance agent that the policy was in full force and effect. However, the lack of an insurable interest present as required by Insurance Code section 286, made the policy invalid.

Ms. Loguercio was an exotic dancer at the Honey Bee Club, and later at the Venus Faire.[1] Von Villas introduced her to Bruce Adams in order for her to obtain employment at International Automotive, an automobile repair shop in which Von Villas had an interest and of which Mr. Adams was manager. Harris Ornburn, Ms. Loguercio's live-in boyfriend from December 1982 until 1984, also knew Mr. Adams and had seen Von Villas at International Automotive.

One night in June 1983, Ford visited Mrs. Loguercio while she was performing at the Venus Faire. He tipped her $320 for her 20-minute performance. She gave him her telephone number and promised to meet him at a motel the following Friday. Ford posed as "Dr. A" or "Dr. Anderson" and offered her $1,000 to be with him. Ms. Loguercio was apprehensive and called Von Villas to have him check out Dr. Anderson. Von Villas called Ms. Loguercio back later in the day and advised her that Dr. Anderson worked for a pharmaceutical company, had lots of money, and that she should "go for it." After she had made the appropriate reservations, Ford called and cancelled the Friday night tryst.

Three weeks later "Dr. Anderson" called Ms. Loguercio and requested that she set up the same type of motel arrangement, which she did, for the evening of June 17, 1983. He promised to pay any of her bills and told her he could write a check for $20,000 to buy her husband out of the house. They were to spend the night together, then go to Dr. Anderson's bank where he would get the $20,000. Ms. Loguercio noticed that Ford (Dr. Anderson) and Von Villas were echoing one another in their comments—particularly concerning her need for money.

---

[1]Ms. Loguercio died on March 11, 1986, of cardiopulmonary arrest, due to pneumonia. Her testimony, given at a preliminary hearing, was admitted pursuant to Evidence Code section 1291.

Ford arrived at the Hollywoodland Motel at approximately 9:30 p.m., and he and Ms. Loguercio drank Vodka and orange juice. She took three "uppers" which were among the several drugs Ford brought to the room. He wore a brown wig, and gave Ms. Loguercio $2,000. After several sexual acts, Ms. Loguercio became concerned when, after she was told to lie facedown on the bed with her hands underneath her, Ford sat on her back and tried to have intercourse with her. She looked back toward him and saw his hand in the air coming down at her. Something dark was in his hand and she heard an elastic-like snapping sound. She turned and jumped up as Ford tried to hide the item in his hand beneath the covers. She was frightened and refused Ford's request that she lie down again. After returning most of his money to him, she dressed and left, claiming that she was ill.

Ms. Loguercio did not report the incident to the police. She did tell her boss at the Venus Faire, Scott, her boyfriend, several of her girlfriends and, a bit later, Mr. Adams and Von Villas about the incident and her belief that Dr. Anderson tried to kill her.

On June 18, 1983, Ms. Loguercio called Von Villas, who returned the call about two days later. Von Villas, in responding to her description of what happened at the motel, reassured her that it was not, as she had perceived, a murder attempt. He asked if she would see Dr. Anderson again. She refused.

Von Villas then began calling Ms. Loguercio rather frequently. Von Villas was interested in her work schedule and that of her boyfriend. She became anxious about the insurance policy situation, and asked Von Villas to cancel the policy. Von Villas claimed he had forgotten the name of the insurance agent.

On July 6, 1983, Ms. Loguercio met with Mr. Adams at the Greek Gardens Restaurant. She told him she believed Von Villas wanted to kill her for insurance proceeds and described the motel room incident with Dr. Anderson. She believed the killing would take place on July 7, 1983, after she got off work at the Venus Faire.

The next day, July 7, 1983, Mr. Adams called her and told her to go to work and not to worry. He called her again that day and asked her out for drinks or dinner after she got off work that night. She agreed.

Mr. Adams and Ford had become friends at the Sepulveda Veterans Administration Hospital where they both received treatment for posttraumatic stress as Vietnam veterans. Mr. Adams was a mechanic and experienced in the care and handling of automatic weapons.

On November 4, 1982, Mr. Adams and Ford took a trip together to Colorado in Ford's station wagon. During the drive Ford stated that he had planned and executed a diamond robbery and had planned another one to take place in Century City at a jewelry mart. He told Mr. Adams that he had obtained salt-and-pepper wigs from a professional makeup artist. It was a friendly trip of four days' duration. The purpose of the trip was to buy automatic weapons; Ford knew Mr. Adams was experienced in dealing with such devices because of his Marine Corps experience.

Just before Thanksgiving of 1982, Ford introduced Mr. Adams to Von Villas. After Mr. Adams did some repair work on Von Villas's car, Von Villas and Ford arranged to open an automotive repair shop, International Automotive, with Mr. Adams as the operator. Ford mentioned that he was planning a jewelry store robbery in Northridge, but that it was too close to Devonshire Division, where he worked. Von Villas listened to this conversation and asked Mr. Adams if he could acquire a "cold plate," one which was no longer registered and had not been reported stolen, in order to disguise the identity of his 1969 Pontiac Grand Prix. Such a "cold plate" was found under the seat of Von Villas's car during a subsequent search thereof.

Around November 28, 1982, the three men met again to start up International Automotive by finding a location and obtaining automobile parts. During this meeting Mr. Adams was shown a shoebox containing approximately 90 loose diamonds and about 20 rings which Von Villas took from the trunk of the Grand Prix. Ford also handled loose diamonds in Mr. Adams's presence. Von Villas offered to trade the diamonds for merchandise.

Von Villas and Ford, as indicated, threatened at this time to kill Mr. Adams if he ever revealed anything about the jewelry store robberies.

In January 1983, Ford and Von Villas had an argument at the offices of International Automotive wherein Ford accused Von Villas of failing to do his job in the Northridge robbery. Ford said he had to enter, take down the customers, and tie them up, while Von Villas merely stood there in the door and waved at two security guards. Von Villas claimed that he had done his job during the robbery. Both Von Villas and Ford once again warned Mr. Adams to say nothing of the robbery or he would be killed.

Mr. Adams finally decided to report matters to the authorities after receiving additional death threats from Von Villas. The automotive repair business was not working out financially, and Von Villas needed money. Von Villas, aware of Mr. Adams's capabilities with automatic weapons, told him that Mr. Adams should go to El Toro and pick up certain automatic and

semiautomatic weapons, ammunition and tear gas. Mr. Adams refused. Von Villas again threatened to kill Mr. Adams, and told him that he would receive a telephone phone call from "a guy at El Toro." Mr. Adams received such a call from a Hal Hansen who described certain weapons and said to Mr. Adams that he would call again to confirm a meeting. Mr. Adams never heard from him again. After Von Villas confirmed that Hal Hansen was the person who would contact Mr. Adams about the weapons, Mr. Adams contacted the FBI and was referred to federal Alcohol, Tobacco and Firearms (ATF) agents in Van Nuys sometime in June 1983. Mr. Adams deemed contact with LAPD as too dangerous since Von Villas and Ford had warned him that if he tried such a contact they would find out about it and kill him.

As it turned out, Mr. Adams had conferred with Agent Oddo of ATF before his appointment to meet Ms. Loguercio on the evening of July 6, 1983, when she expressed her fear that Von Villas and Ford were trying to kill her to obtain the insurance proceeds. Fearing that Ms. Loguercio was being used by Von Villas to obtain illegal firearms, Agent Oddo affixed a body transmitter on Mr. Adams's body. The conversation wherein Ms. Loguercio expressed her fears was thus recorded.

On July 7, 1983, Von Villas arrived at International Automotive shortly before noon. Mr. Adams confronted Von Villas with Ms. Loguercio's allegation that he, Von Villas, was trying to kill her for the $100,000 insurance proceeds, and that "Dr. Anderson" was Ford. Von Villas became evasive and denied the allegation. When Mr. Adams related the facts surrounding the attempt on Ms. Loguercio's life at the Hollywoodland Motel, Von Villas "got real nervous" and started to stutter. Ford then arrived and Mr. Adams confronted him with the "Dr. Anderson routine." Ford and Von Villas then left the office. Five minutes later they returned and Von Villas asked Mr. Adams if he wanted to "make the hit." Mr. Adams agreed in order to further elicit details for Agent Oddo's benefit. Von Villas told Mr. Adams that he had to help because Ms. Loguercio was afraid of both Ford and Von Villas. Ford would actually do the "hit" with Mr. Adams accompanying him. Ford and Mr. Adams would receive $12,500 each.

Mr. Adams then called Ms. Loguercio. While talking to her about their midnight meeting planned for that night, Von Villas handed him three notes with questions which Mr. Adams blended into the conversation. The notes concerned how much her boyfriend knew, if she would go to dinner and perhaps a motel with Mr. Adams, and a reminder to Mr. Adams that he would get $12,500. These notes were recovered and, after expert analysis, were found to have been written by Von Villas.

Von Villas then told Mr. Adams that the "hit" had to look like a sex crime and that it had to take place in Hollywood. He added that this would make

the killing look like just another prostitute case, and that Hollywood homicide teams were overloaded with cases so the investigation would be slow. Ford was told by Von Villas to find a location for the body to be dropped and to find some rug or rubber pad under which Ford could hide in the back of Mr. Adam's van, the vehicle which would be used for transportation that night. Although Mr. Adams was wired with a transmitter, the recording of the conversations made in his presence was unintelligible because of mechanical difficulties.

At approximately 3 p.m. on July 7, 1983, Mr. Adams met ATF Agent Oddo and made three monitored and recorded phone calls, one to Von Villas at his home and the other two to Ford. Ford confirmed that the body would be dropped off at Orange Drive, just off Mulholland, and requested that Mr. Adams obtain some long-necked bottles. That afternoon ATF agents installed electronic surveillance equipment in the van. LAPD was notified by Agent Oddo about the plans for the night.

At approximately 9 p.m., Detective Henry Cardena, LAPD, observed Ford arrive at International Automotive carrying a large guitar case and a dark briefcase which he referred to as "a homicide kit." Ford told Mr. Adams again that the murder had to look "like some maniac got a hold of this woman and just plain did her." Ford was planning to drug Ms. Loguercio with Tuinal capsules. Two individuals dropped by the shop at this point and, after they left, Ford said "that's two people that can put us together now." This comment was taped.

About 9:40 p.m. Ford and Mr. Adams left the shop and proceeded to the Venus Faire for a rehearsal of the plan. Ford reassured Mr. Adams that he had gloves so he could punch Ms. Loguercio's teeth out. The van arrived at 11629 Van Owen where it backed behind a building to an area with several loading or trash bins. Ford and Mr. Adams were looking for a place to dump the body. The van then went to a 7-Eleven store in North Hollywood. Mr. Adams got out and went into the store, while Ford rearranged the blanket in the back of the van. Ford returned to the passenger seat and began mixing Tuinal in the beer that Mr. Adams had just purchased. He also started laying out the contents of his "homicide kit."

At 11:45 p.m. the van parked in front of the Venus Faire and Mr. Adams got out and walked towards the establishment. Detective Cardena and other LAPD officers then converged on the van and arrested Ford, who was underneath the blanket in the back of the van. He had a loaded .22-caliber Derringer in his pocket. At approximately 2 a.m. Von Villas was arrested at his home on Goshen Street in Simi Valley.

Ford's homicide kit contained two knives or daggers, a mask, lubricating jelly, rope, a pair of brown gloves and containers of pills.

At trial, Mr. Adams was impeached with prior inconsistent statements and declared to be less than credible. He was characterized as dishonest and a liar. It was also alleged that he had received preferential treatment by the officers in return for his cooperation as a prosecution witness in the case.

## C. *The Von Villas and Ford Defenses*

Von Villas denied participation in the Schaffer & Sons robbery, denied admitting that he committed the robbery to Mr. Adams and denied that he had planned to kill Ms. Loguercio.

Von Villas had worked in several overtime jobs and was a successful real estate investor and businessman. His comment to Gayl West that he could arrange to have people taken care of was merely a suggestion that, because he had worked as a bodyguard, he could arrange for that type of protection for others. He attributed the appearance of the rubber gloves in his boot to his ownership of a ranch in Simi Valley, where horses were boarded and rubber surgical gloves were used in providing them first aid. The ranch had been traded for the Goshen Street house. He inherited several pieces of jewelry from his mother's estate on her death in 1970, and bought many loose stones in Hong Kong prior to her death, when he was recuperating from wounds received in Vietnam. He began seriously trading diamonds in 1982, but only those which he had acquired legally. The brass ring which allegedly was in the possession of Schaffer & Sons was acquired from Mr. Bill Justice at the Simi Valley swap meet. As to the bindle marked with notations, which was lost while in police custody, Von Villas recalled acquiring several plain paper bindles from a jeweler named Mr. Kaplan. He also recalled going to Schaffer & Sons in late October or early November 1982, where he wrote information provided by the salesperson at the jewelry store on the plain bindles. He claimed the notations on the lost bindle were in his writing.

Von Villas met Ford in the late 1970's or early 1980's. Ford asked Von Villas if he could help obtain a disguise for him so he, Ford, could attempt to find the man who raped his wife, a drifter who frequented the streets of Hollywood. Both men acquired the disguises and makeup from Ms. Chefalo after being referred by Jack Stone. Von Villas and Ford cruised the streets of Hollywood in search of the rapist.

Von Villas did in fact attempt to assist Ms. Loguercio in her efforts to finance the paper sale of the house owned by her and her ex-husband, and

did indeed arrange for the acquisition of a life insurance policy that would serve to cover mortgage payments upon the death of either him or her. Von Villas always knew, however, that there was no insurable interest in existence and would not be until escrow closed on the sale. Because it never closed, he knew that the policy was not in full force and effect on July 7, 1983. He never told Ford about the insurance policy until that date. He never discussed with Ford any plans to drug Ms. Loguercio at the Hollywoodland Motel on June 17, 1983, although he knew Ford used the "Dr. Anderson" name in order to facilitate his encounters with her. He denied that Ms. Loguercio told him that "Dr. Anderson" tried to kill her on that night.

Von Villas was experiencing grave business problems at International Automotive because Mr. Adams was performing shoddy work and stealing money from him. There were strong words between them. On the afternoon of July 7, Von Villas and Mr. Adams once again traded harsh words based upon customer dissatisfaction, and Mr. Adams responded, "Joan thinks you're trying to kill her." Von Villas stated that Mr. Adams should not play games, to which Mr. Adams stated, "if the price is right, I'll do it." Von Villas replied, "all right Bruce, I will give you 25,000 bucks." At this point Ford arrived and, at Von Villas's suggestion, Ford and Von Villas went outside where Von Villas stated that he wanted to trigger a "panic attack" in Mr. Adams. They both decided to go along with the charade, and told Mr. Adams to go forward with the killing. Von Villas made up notes to Mr. Adams solidifying the plan, as Mr. Adams talked to Ms. Loguercio about their planned meeting at midnight that evening.

Von Villas drove to his home about 2 or 2:30 p.m. that afternoon, took some medicine because he was not feeling well, and tried to sleep. Mr. Adams called him about 3:20 p.m. and further plans were discussed for the killing that evening. About 5:39 p.m. Von Villas and Ford talked on the telephone. Von Villas asked Ford not to meet Mr. Adams at the shop that night and just forget about what they had discussed earlier in the day. Ford reluctantly agreed. Von Villas then stayed at home until his arrest.

Ford denied that he and Mr. Adams had acquired weapons in Colorado. They had gone to purchase Mac-10's but never reached their destination because of car trouble. In spite of bad reports from many as to Mr. Adams's credibility and work habits, Ford did go into business with Mr. Adams in the International Automotive shop on January 1, 1983. Ford did participate in a treatment program for combat-related stress problems as well as psychological problems resulting from his being shot while on duty as a police officer and his wife's brutal rape in November 1980. At the time his terminally ill mother-in-law was living with him and his disabled wife. He felt that his life was a mess and he drank heavily.

Ford first met Ms. Loguercio in January 1983, at a time when Mr. Adams was dating her. He became attracted to her.

In his efforts to apprehend the man who raped his wife, Ford, along with Von Villas, had indeed acquired the appropriate disguises from Mr. Stone and Ms. Chefalo. He used the disguise some 10 to 15 times in his unsuccessful pursuit of "Skip," his wife's rapist, before the beard disintegrated. He never robbed a jewelry store.

As to the events of July 7, 1983, Ford appeared at International Automotive to pick up money from Mr. Adams, who had requested that Ford drop by. Upon his arrival, Mr. Adams stated, "you guys are trying to kill Loguercio." He followed by saying, "I'm going to get her for twenty five thou." Ford turned to Von Villas and asked what this was all about, and Von Villas told Ford they should go outside. There, they talked. Von Villas indicated that the insurance policy that Mr. Adams had mentioned as the motivation for killing Ms. Loguercio was not effective until escrow closed on a real estate deal she and Von Villas had entered into. They both decided that they were "playing another game with Mr. Adams." They then returned to the shop and told Mr. Adams "Fine, if you're going to kill Loguercio, that's fine. Now tell me about where you get this idea that there is an insurance policy and what's the story, what's going on." Mr. Adams then reiterated the description of events at the Hollywoodland Motel of June 17, 1983, when Ford, alias "Dr. Anderson," tried to kill Ms. Loguercio. Ford told Von Villas, "Halt, you know, let's push him," in an effort to prod Mr. Adams into further action.

Ford and Von Villas continued to play along with Mr. Adams, Ford receiving the assignment of providing a "homicide kit" as requested by Mr. Adams. Ford arrived at the shop and proceeded on the route to the Venus Faire with all necessary equipment that might be needed for the killing, but had no intent to kill Ms. Loguercio. Ford's only reason for stating that the killing had to look like a vicious sex attack was to force Mr. Adams to back down. He never thought Mr. Adams would go forward with the killing, and would have backed down had Mr. Adams arrived back at the van with Ms. Loguercio.

As for the June 17, 1983, incident, Ford never intended to kill Ms. Loguercio at the Hollywoodland Motel. Although he had told Mr. Adams that he had a garrote in his hand, the item was actually a sexual device. He did in fact use the alias "Dr. Anderson."

As to the jewelry store robbery, Ford denied having committed the robbery. In his view, he was mistakenly identified as one of the robbers.

III

ISSUES PRESENTED

A. *Introduction*

Both Von Villas and Ford present multiple issues for review. Some relate to each appellant individually, and some to both. They will be discussed seriatim.

B. *The Constitutional and Statutory Newsperson's Shield Law*

1. *Factual Summary*

Von Villas served a subpoena duces tecum on Jan Golab, a freelance writer, demanding that he produce certain materials, including notes and audiotapes, gathered by him from Mr. Adams in order to write an article for Hustler magazine. The article, entitled *The Dark Side of the Force,* was published in the March 1985 edition. On July 7, 1986, Mr. Golab invoked his rights under Evidence Code section 1070, the so-called "newsperson's shield law," in his motion to quash the subpoena duces tecum.[2] The trial court conducted a hearing, wherein Mr. Golab testified that he had in his possession the items called for in the subpoena as well as audiotapes and other

---

[2]In June, 1980, the California voters approved Proposition 5. That proposition incorporated language virtually identical to Evidence Code section 1070 into the California Constitution, as article I, section 2, subdivision (b). It states in its entirety:

"A publisher, editor, reporter or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"Nor shall a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."

For purposes of this decision the "newsperson" includes, collectively, those entitled to assert the protections of art. I, § 2, subd. (b).

notes he acquired from various LAPD officers in preparation for an article entitled *Cops Who Catch Cops* which was published in the September 1984 edition of Los Angeles magazine. The judge, with all parties in agreement, broadened the call of the subpoena duces tecum to include all unpublished information acquired by Mr. Golab in the preparation of both articles, and indicated that both California statutory and constitutional protections afforded newspersons would be considered relevant to the hearing on the motion to quash the subpoena duces tecum.[3]

During the hearing on the motion, Mr. Golab claimed that his purpose in invoking the shield law was to fulfill his vows of confidentiality made to some of his sources (principally Mr. Adams), and to protect his financial interest in his work product in the event movies or other publications might ensue. Ford and Von Villas claimed that their rights to a fair trial, particularly their rights to obtain discovery of prior statements of Mr. Adams that might be appropriate material for impeachment as prior inconsistent statements, would be violated if they were denied access to the notes and tapes. Their view was that Mr. Golab's principal objective in asserting his newsperson's shield rights was to preserve his pecuniary interest in future publications or films. This objective, in their opinion, was of lesser significance than the rights of the appellants to effectively cross-examine Mr. Adams, a key prosecution witness. They asserted that a state constitutional provision providing a shield to newspersons (in this case a freelance journalist) must give way to the federal and state constitutional rights of Von Villas and Ford to confront the witnesses presented against them.

Mr. Golab testified originally that he had taped approximately 20 to 30 minutes of Mr. Adams's conversation with him at a time when he was not under contract with Hustler to write the article, but later amended his testimony to reflect that he had only made notes during that time, and had not taped anything. He further testified that he would invoke the shield's protection and refuse to turn over the items sought whether called by the prosecution or the defense. Finally, in response to a showing that the witness, Mr. Adams, waived any interest he had in maintaining the confidentiality of the materials in Mr. Golab's possession, Mr. Golab testified that he felt Mr. Adams's waiver of confidentiality was coerced, or, at the least, not sincere. In any event, Mr. Golab stated that he would assert his constitutional protections regardless of Mr. Adams's waiver of confidentiality.

---

[3]Evidence Code section 1070 and article I, section 2, subdivision (b) are practically identical, save for minor differences in wording, thus the constitutional provision will be considered controlling this matter. Analysis of article I, section 2, subdivision (b) applies with equal force to Evidence Code section 1070, since discussions concerning state constitutional provisions apply with equal force to their substantially identical statutory counterparts. (*Union Pacific R.R. Co.* v. *State Bd. of Equalization* (1989) 49 Cal.3d 138, 146 [260 Cal.Rptr. 565, 776 P.2d 267].)

At the hearing on the motion to quash the subpoena duces tecum, counsel and the court agreed that all materials held by Mr. Golab constituted "unpublished information" and that the appropriate burden upon Von Villas and Ford in attempting to discover the materials was to demonstrate a ". . . reasonable possibility that the evidence sought might result in [their] exoneration." (*Hammarley* v. *Superior Court* (1979) 89 Cal.App.3d 388, 399 [153 Cal.Rptr. 608].) As to the brief period of time during which Mr. Golab discussed the preparation of the article with Mr. Adams before entering into the Hustler contract, there was no determination made as to whether Mr. Golab would qualify as a "newsperson" for purposes of the shield provision, but the "unpublished information" generated during that time was de minimis.

Counsel for Von Villas and Ford were denied their request to review Mr. Golab's materials in camera with the court, but the trial court, Mr. Golab, and his counsel did review the Hustler magazine materials in camera to determine whether or not discovery of the materials was warranted. Although the Los Angeles magazine materials were not reviewed in camera, the court determined that none of the interviews conducted in preparation of that article involved Mr. Adams, and the article itself only briefly mentioned Von Villas and Ford. The materials for the Los Angeles magazine article were found irrelevant, thus their nondisclosure was protected by the shield provision.

With respect to the unpublished materials gathered for the Hustler article, the court granted the motion to quash, and ruled that Mr. Golab qualified for the "shield" protection; that the materials were relevant; that they contained nothing that would constitute impeachment material; and that, in any event, there was nothing in the tapes qualifying as an inconsistent statement by Mr. Adams not already made available to Von Villas and Ford from the record. The trial court further found that there was "no reasonable possibility that any of the materials in Mr. Golab's possession as to either the *Hustler* article or the Los Angeles Magazine article would exonerate a defendant or provide any impeaching evidence. Everything that I have seen indicates consistency with the evidence of record." In balancing Mr. Golab's rights to maintain the confidentiality of his unpublished information with the rights of Von Villas and Ford to a fair trial, the judge ruled that Mr. Golab's rights would prevail.

### 2. *Discussion*

Von Villas and Ford pose the following questions:

a. Does Mr. Golab, a third party witness and freelance journalist, qualify for the protections afforded a "newsperson" under article I, section 2,

subdivision (b) of the California Constitution and Evidence Code section 1070?

b. Does the California Supreme Court decision in *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785 [268 Cal.Rptr. 753, 789 P.2d 934] assist in the disposition of these issues?

c. Did the trial judge correctly apply the *Delaney* balancing test in the case at bar?

d. Whether application of the *Delaney* balancing test to the facts of the case at bar unconstitutionally burdens Von Villas's and Ford's right to a fair trial?

3. *Mr. Golab, a Freelance Journalist, Qualifies for the Constitutional Protections Afforded by Article I, Section 2, Subdivision (b) and Evidence Code Section 1070 With Respect to All Unpublished Information in His Possession*

Article I, section 2, subdivision (b) of the California Constitution expressly states, in part: "[a] publisher, editor, reporter or other person connected with or employed upon a . . . magazine . . . or any person who has been so connected or employed, shall not be adjudged in contempt . . . for refusing to disclose any unpublished information obtained . . . for communication to the public."

■ In discussing the language of the shield provision, certain guidelines are clear. The intent of the voters controls when reviewing constitutional provisions adopted by them. (*Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278]; *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 618 [194 Cal.Rptr. 294].) To determine that intent, " 'The court turns first to the words themselves for the answer.' " (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' " (*Delaney* v. *Superior Court, supra,* 50 Cal.3d 785, 798, quoting *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

■ The constitutional provision plainly encompasses Mr. Golab's position as a freelance writer "connected with or employed upon . . ." both Hustler and Los Angeles magazine within its protective shield.

Ford asserts that "unpublished information" acquired by Mr. Golab before he entered into the Hustler contract was not within the constitutional shield of article I, section 2, subdivision (b). To this assertion the trial judge opined ". . . that I believe that Golab is entitled to certain statutory and constitutional protection provided in this state except possibly for the freelance period. But with regard to his freelance status, I find . . . that it represents an unsignificant phase of his activity on this article." The trial judge continued, "[f]urthermore, I would have serious trouble discriminating against his freelance status under the . . . constitutional protections, because . . . when someone as a freelance needs to develop a relationship to be able to 'pitch' an article, that person's status is . . . not fairly distinguishable from that of someone who is in the employ of an agency. . . . Therefore, I would have serious equal protection problems with distinguishing between Golab, the freelance, and Golab, the *Hustler* special editor. . . ."

Mr. Golab had been a reporter or freelance writer for some 13 years prior to his involvement with the instant articles. The clear language of article I, section 2, subdivision (b) provided him with newsperson's shield protection both before and after the execution of the written Hustler contract.

Although the unpublished information obtained before execution of the Hustler contract was found by the trial court, after in camera review, to be both insignificant and irrelevant, it was obtained by Mr. Golab within the constraints of article I, section 2, subdivision (b).

Clearly, the trial judge's decision that Mr. Golab's precontract and post-contract unpublished information was protected by the shield provision was amply supported by substantial evidence. As such, it will not be overturned absent an abuse of discretion. (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 816.) We conclude that there was no abuse of discretion.

Alternatively, the record supports the conclusion reached by the trial judge that the precontract unpublished information was irrelevant in that it contained no interview materials concerning Mr. Adams and only a passing reference to Ford and Von Villas. Such a finding constitutes a ruling under Evidence Code section 352 which will not be overturned absent an abuse of discretion. (*People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468].)

The trial judge substantially complied with the standards set forth in *Delaney.*

### 4. *The Delaney Decision*

*Delaney* was handed down some four years after the trial judge granted Mr. Golab's motion to quash the subpoena duces tecum. Nonetheless, its

analysis of the constitutional shield provision is most helpful in resolving the issues before this court.[4]

There is no question that the protection of the shield provision gives way when nondisclosure of otherwise protected unpublished information would deprive a criminal defendant of his federal constitutional right to a fair trial under either the Sixth Amendment or the due process clause of the Fourteenth Amendment. (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 805.) The question we now consider is: what showing must the criminal defendant make in order to overcome the newsperson's claim of immunity under the shield provision?

Trial counsel for Von Villas enunciated his view of the burden upon his client when he stated:

". . . we have to show a relevance toward exoneration, that the supposed material might lead to exoneration. . . . If we could make a showing that that evidence could possibly . . . —and the cases use the word 'possibly' lead to exoneration in a criminal case, we are entitled to the discovery and disclosure."

The trial judge tentatively ruled that:

". . . it does not appear to me that there has been a showing of reasonable possibility that the materials, the unpublished materials in Mr. Golab's possession would exonerate the defendants or would lead to impeaching evidence of Mr. Adams."

After reviewing the unpublished materials in camera, the trial judge stated that he was:

". . . persuaded absolutely that there is no reasonable possibility that any of the materials in Mr. Golab's possession as to either the *Hustler* article or the *Los Angeles Magazine* article would exonerate a defendant or provide any

---

[4]Counsel for appellant Ford would have us conclude that *Delaney* should be applied retroactively to the instant case since the case is not yet final. Citing *Griffith* v. *Kentucky* (1986) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708], his assertion seems to be that *Delaney* represents a new rule for the conduct of criminal prosecutions. Thus:

". . . [It] is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." (479 U.S. at p. 328 [93 L.Ed.2d at pp. 661-662].)

We decline to determine the retroactivity *vel non* of *Delaney* either under the *Griffith* rubric or the analysis concerning retroactivity *vel non* of judicial decisions which do not establish a new rule of law set forth in *People* v. *Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635].

impeaching evidence. Everything that I have seen indicates consistency with the evidence of record."

 ██ █ In articulating the threshold showing which must be made by the criminal defendant when faced with an article I, section 2, subdivision (b) claim by a newsperson, trial counsel and the trial judge correctly applied the standard expressed in *Hammarley* v. *Superior Court*, *supra*, 89 Cal.App.3d 388 at page 399:

"Faced with a claim of privilege, the burden is on the party seeking to avoid the privilege competently to demonstrate not only that the evidence sought is relevant and necessary to his case, but that it is not available from a source less intrusive upon the privilege. Moreover, as with any attempt to discover evidence subject to a claim of privilege, a defendant must show a reasonable possibility that the evidence sought might result in his exoneration (*People* v. *Borunda* (1974) 11 Cal.3d 523, 527 [113 Cal.Rptr. 825, 522 P.2d 1])."[5]

In *Delaney* v. *Superior Court*, *supra*, 50 Cal.3d at page 808, a 1990 decision, the court stated:

"We hold that, to overcome a prima facie showing by a newsperson that he is entitled to withhold information under the shield law, a criminal defendant must show a *reasonable possibility* the information will materially assist his defense. A criminal defendant is not required to show that the information goes to the heart of his case."

Interestingly, the *Delaney* court cited *Hammarley* v. *Superior Court*, *supra*, and *Hallissy* v. *Superior Court* (1988) 200 Cal.App.3d 1038 [248 Cal.Rptr. 635], the authorities, inter alia, followed by the trial judge as containing language consistent with the holding as to the threshold showing which a criminal defendant must make in order to overcome the shield claim.

"Indeed, neither court determined that the information at issue went to the 'heart of the case,' nor did they even use the term. As to the threshold showing required, the decisions are consistent with the test we adopt in this case." (*Delaney* v. *Superior Court*, *supra*, 50 Cal.3d at p. 808, fn. 22.)

 Whether the criminal defendant must show a reasonable possibility the information "*might* result in his exoneration" (*Hammarley*) or "will

[5]It is clear that article I, section 2, subdivision (b) and Evidence Code section 1070 do not create a privilege, but rather provide an immunity from being adjudged in contempt. (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 274 [208 Cal.Rptr. 152, 690 P.2d 625].)

materially assist his defense" (*Delaney*) present different standards or not,[6] it is clear in the case at bar that the trial judge's finding, after a careful review of the "unpublished information," that appellants did not make a showing which would warrant the denial of the motion to quash, was correct. In short, there was no requirement for the trial court to balance the interests of the newsperson with those of the criminal defendant as set forth in *Delaney*. The express findings of the trial judge included a referral to "exoneration" but, importantly, included language confirming that the materials would not be utilized to impeach Mr. Adams, or any other witness. Since the sole objective of appellants was to acquire material to impeach Mr. Adams, the trial judge appropriately granted the motion to quash.

Even if Von Villas and Ford were able to convince the trial judge that the shield provisions must yield to their right to a fair trial, it is also clear that the trial judge, who was intimately familiar with the facts of the case, and who had carefully reviewed the unpublished information, found:

". . . there is nothing in those tapes that represents significant impeachment information at all. And the only reason why I use the term significant is because there may be an inconsistency there with something said someplace. But if it is, it is an inconsistency that exists elsewhere. There is nothing, in other words, in any of the tapes that I haven't heard elsewhere in these proceedings or the material . . . in the defense possession."

Although *Delaney* discusses the alternative-source requirement at length, its holding provides that:

"For all the foregoing reasons, we conclude that a universal and inflexible alternative-source requirement is inappropriate in a criminal proceeding. In considering whether the requirement is appropriate in a given case, the trial court should consider the type of information being sought (e.g., names of potential witnesses, documents, a reporter's eyewitness observations), the quality of the alternative source, and the practicality of obtaining the information from the alternative source. The trial court must also consider the other balancing factors set forth above: whether the information is confidential or sensitive, the interests sought to be protected by the shield law, and the importance of the information to the criminal defendant. In short, whether an alternative-source requirement applies will depend on the facts of each case." (*Delaney* v. *Superior Court, supra*, 50 Cal.3d at pp. 812-813.)

---

[6]We are cognizant of the *Delaney* language which expressly sets forth the distinction between "exoneration" and "assisting the defense." (*Delaney* v. *Superior Court, supra*, 50 Cal.3d at p. 809.) Nonetheless, we find that the trial judge's order denying the motion to quash reflected that he considered both types of evidence, that which would provide "exoneration" and "assist the defense," in reaching his conclusion.

The trial judge's finding regarding the alternative source available to appellants for Mr. Golab's unpublished information was reasonable.

In conclusion, even if it was error for the court to refuse to turn over the unpublished information because, arguendo, appellants were successful in making the requisite showing to overcome the shield claim, it is clear that the alternative source available to them would support the trial court's decision to grant the motion to quash.

> 5. *The Balancing Test Set Forth in Delaney, to the Extent That It Considers the Interests of a Newsperson, Did Not Unconstitutionally Burden the Rights of Ford and Von Villas to a Fair Trial*

As counsel for Ford concedes, this court is bound *not* to accept his argument that the right to a fair trial is of such magnitude that once a threshold showing that information held by a newsperson and not available from other sources will assist the defense, the newsperson's interests must cede to the defendant's right to a fair trial. To accept such an argument would fly in the face of the *Delaney* majority decision. Under appellants' view, as espoused by Justice Mosk in his concurrence in *Delaney, supra,* 50 Cal.3d at page 809, footnote 24, there is nothing to balance.

This court, bound by the principles of *stare decisis*, is, therefore, bound by *Delaney. (Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)

> C. *The Trial Court's Denial of Von Villas's Motion to Suppress Evidence Pursuant to Section 1538.5\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> D. *The Loss of the Diamond Bindle, the Admission Into Evidence of Secondary Evidence in Its Place, and the Refusal of Von Villas's Request for Jury Instructions Regarding the Loss of the Bindle*

> 1. *Factual Summary*

Von Villas and Ford stand convicted, inter alia, of three counts of robbery, three counts of false imprisonment and three counts of assault with a firearm. These charges related to the robbery of the Schaffer & Sons jewelry store in Northridge.

During the July 8 search of the Von Villas residence officers found a diamond bindle, a small paper container used to package loose diamonds,

---

*See footnote, *ante*, page 201.

which had certain writing on it, supporting the inference that the bindle was from Schaffer & Sons. The bindle, identified by the police as item 45, was booked into evidence on that date and described on the property report by the officers conducting the investigation. The LAPD property clerk confirmed that the portion of the property report describing item 45 contained the notations "Empty diamond bindle - N.R.N. 200 B4 5.06 with a 9 and a circle." Below that was the note "105 and two little zeros slash 79 and two little zeros, E-A. . . ." The clerk further testified that it was her practice to compare the information describing the item contained on the property report with the actual item itself before booking the item into evidence.

On or about October 21, 1983, the diamond bindle was discovered to be missing. Extensive searches for the bindle by several officials proved unsuccessful.

The trial judge found that the diamond bindle was lost or destroyed without fraudulent intent; that there were diligent, good faith efforts made to locate the bindle; and that the portion of the property report containing the description of the bindle, including the notations thereon, was admissible as either a business record under Evidence Code section 1271, or that the contents thereof could be read into the record as past recollection recorded of the officer who created the property report under Evidence Code section 1237. The trial judge also preliminarily granted the prosecution's motion to substitute secondary evidence of the bindle pursuant to Evidence Code sections 1501 and 1505, subject to the appropriate foundational proof.

### 2. Discussion

Von Villas asserts that his Fourteenth Amendment due process rights were violated because police officials lost a diamond bindle which contained writing and had been booked as evidence of the robbery charge. Von Villas claims that the loss of the bindle brought about a violation of section 1536 which provides that an officer *must* retain any property taken pursuant to a search warrant. He further asserts that the lost bindle was material, since any item seized pursuant to a search warrant is, by definition, material. Finally, the loss of the bindle, according to Von Villas, was tantamount to "suppression of evidence favorable to the accused because evidence seized pursuant to warrant is generally the most relevant evidence in a criminal case," all in violation of the standards set forth in *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194].

Von Villas bolsters his argument by positing that had the police not lost the bindle, he would have been able to prove that the writing thereon was his

own, and not that of the Schaffer & Sons personnel, as he had advised the jury at trial. Loss of the bindle meant that no expert witness could analyze the writing thereon. To stress the importance of the lost bindle as exculpatory evidence for the defense, Von Villas cites this court to the January 9, 1988, letter of Jury Foreperson Burke to the trial judge, wherein the foreperson discussed the mental processes used by the jurors in handling the lost bindle issue. That letter was not admitted as evidence, as Evidence Code section 1150, subdivision (a) expressly provides that such a document must be excluded, and we must therefore disregard its contents for purposes of deciding the question before us.

Von Villas next claims that the trial judge compounded the due process violations perpetrated upon him by loss of the bindle when he ruled that secondary evidence of the bindle would be admitted pursuant to Evidence Code sections 1501 and 1505.[17]

Finally, Von Villas contends that the trial judge improperly refused jury instructions regarding the inferences that the jurors should draw against the prosecution because of the loss of the bindle.

3. *Analysis of Section 1536, the Materiality of the Bindle and Trombetta.*[18]

Von Villas presents a novel analysis of section 1536, citing no authority in support of his position. That section provides:

"All property or things taken on a warrant must be retained by the officer in his custody, subject to the order of the court to which he is required to retain the proceedings before him, or of any other court in which the offense in respect to which the property or things taken is triable."

We are asked to conclude from the language of section 1536 that when an officer, in possession of property seized pursuant to a search warrant, through inadvertence or neglect, loses or destroys the seized property, that error will bestow upon the defendant against whom the missing evidence was to be offered certain unique rights. Apparently a defendant in the same

---

[17]"A copy of a writing is not made inadmissible by the best evidence rule if the writing is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence." (Evid. Code, § 1501.)

"If the proponent does not have in his possession or under his control a copy of a writing described in Section 1501, 1502, 1503, or 1504, other secondary evidence of the content of the writing is not made inadmissible by the best evidence rule. This section does not apply to a writing that is also described in Section 1506 or 1507." (Evid. Code, § 1505.)

[18]*California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528].

position as Von Villas, but facing evidence that was *not* seized pursuant to a search warrant, and that, as in this case, was inadvertently lost or destroyed by the officials, would *not* be the beneficiary of the special "rights" afforded a defendant under section 1536.

Thus, Von Villas's reading of section 1536 would clearly create an equal protection concern: the creation of greater rights among those facing evidence garnered (and lost) through search warrants as opposed to those facing evidence acquired (and lost) without a search warrant. We refuse to endorse this circuitous reasoning.

■ Section 1536 was enacted in order to provide controls over those officials in possession of property seized pursuant to a search warrant, pending resolution of the disposition of the property, either through an order granting a motion for release of improperly seized materials or an order admitting the items seized into evidence. It was not enacted in order to punish officers who inadvertently lost evidence seized pursuant to a search warrant, and imbue defendants in the position of Von Villas with a statutory right to assert a due process claim. (See *California* v. *Trombetta, supra,* 467 U.S. 479.)

■ There is no question that the bindle was material and relevant to the case. If it had not been lost, it would have represented potent evidence against Von Villas, since the notations thereon would allow the trier of fact to infer that a diamond bindle found in the Von Villas home on July 8, 1983, was at one time in the Schaffer & Sons Northridge store which was robbed on November 22, 1982. Von Villas testified, and there was no dispute on the issue, that he was a fairly regular customer at that store from 1973 to 1983. He also testified that he wrote the markings on the diamond bindle, item 45, based upon information received from a salesperson at Schaffer & Sons.

The next question, then, is whether this court must conclude that the diamond bindle was material, with no further analysis, merely because it was seized pursuant to a search warrant, and for that reason alone.

Von Villas claims that evidence seized pursuant to a search warrant is not simply material that might be of conceivable evidentiary significance in a criminal prosecution. He argues that "in order to obtain the warrant, the peace officer swears in his affidavit to the materiality of the items being seized. In issuing the warrant, the magistrate agrees that the evidence is material to prove the crimes for which the evidence is sought." No other authority is cited for this proposition.

Obviously the determination as to whether evidence is "material" or not cannot be made prior to or during a search pursuant to a search warrant. The

legal test applicable at that time is whether or not there is probable cause to believe that the property described in the warrant may be found at the location to be searched. The point at which materiality must be considered is at trial, when evidence seized pursuant to the search warrant is offered by a party.

In short, we refuse to accept Von Villas's argument that the diamond bindle must be declared "material" simply because it was identified in the affidavit supporting the warrant ("stolen diamonds, containers used to store and transport diamonds") by the officer swearing to the affidavit. Nor does the fact that the magistrate authorized the search warrant ipso facto place upon the bindle the mantle of materiality.

As indicated, there was ample evidence presented at trial to support the conclusion that the bindle was material, but this evidence was presented after its inadvertent loss by police officials.

We conclude, therefore, that section 1536 does not afford defendants faced with items of evidence seized pursuant to a search warrant unique constitutional rights not afforded other defendants in similar positions, but faced with evidence seized without a search warrant.

We cannot find that merely because an item is identified in a search warrant supported by an affidavit setting forth adequate probable cause, that it becomes, ipso facto, material evidence. The fact that a magistrate authorized the issuance of the search warrant has no bearing on the determination of materiality.

The loss of the bindle was not tantamount to suppression of evidence favorable to the accused in violation of the mandate of *Brady* v. *Maryland*, *supra*, 373 U.S. 83, and its progeny.

### 4. *Trombetta and Youngblood*

Assuming that the bindle in question was material, was its loss by law enforcement officials a violation of Von Villas's rights to due process of law under *California* v. *Trombetta*, *supra*, 467 U.S. 479, and *Arizona* v. *Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333].

In *California* v. *Trombetta*, *supra*, 467 U.S. 479, 491 [81 L.Ed.2d 413, 423-424], the high court, in a unanimous opinion, held that the due process clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath

analysis tests at trial. ■ In reaching its conclusion, Justice Marshall set forth the appropriate analysis for determining whether evidence is constitutionally material:

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. [Fn.] To meet this standard of constitutional materiality, see *United States* v. *Agurs*, 427 U.S. at pp. 109-110 [49 L.Ed.2d at pp. 353-354], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. . . ." (*California* v. *Trombetta, supra,* 467 U.S. at pp. 488-489 [81 L.Ed.2d at pp. 421-422].)

The *Trombetta* court found that there was no allegation of "official *animus* toward respondents or of a conscious effort to suppress exculpatory evidence." (467 U.S. at p. 488 [81 L.Ed.2d at pp. 421-422].) The same is true here.

■ Applying the *Trombetta* materiality test to the facts before us, it is patent that, at the time of its loss, the bindle did not "possess an exculpatory value that was apparent before the evidence was destroyed" as required by the first prong of the two-pronged *Trombetta* test.[19] Admittedly, it would be difficult to conclude that the second prong of the *Trombetta* materiality test was satisfied by the prosecution. Von Villas could hardly obtain comparable evidence by other reasonably available means if the purpose of his use of the bindle was to conduct handwriting analysis thereon for purposes of proving that he authored the notations on the bindle. The notes contained in the property report describing that which was written on the bindle were written by the seizing officer. But *Trombetta*'s two-pronged materiality test is not in the disjunctive, but rather the conjunctive. Before an item, such as the bindle, can be classified as "constitutionally material," both elements of the *Trombetta* test must be fulfilled.

■ Further, the mere possibility that an item of undisclosed evidence might have helped the defense or might have affected the outcome of the trial does not establish materiality in the constitutional sense. (*United States* v. *Agurs, supra,* 427 U.S. 97, 109-110 [49 L.Ed.2d 342, 353-354]; *People* v. *Brown* (1982) 138 Cal.App.3d 832 [188 Cal.Rptr. 324].)

■ Von Villas asserts that *Trombetta* can be easily distinguished from the case at bar, and that application of the standards set forth in *Arizona* v.

---

[19]Obviously, in order for evidence to "possess an exculpatory value that was apparent before the evidence was destroyed," it must appear exculpatory to the law enforcement officials responsible for its safekeeping. (*People* v. *Gonzales* (1986) 179 Cal.App.3d 566, 573 [224 Cal.Rptr. 853].) Any other analysis would be illogical. (See *Arizona* v. *Youngblood, supra,* 488 U.S. at p. 56, fn. 26 [102 L.Ed.2d at p. 288].)

*Youngblood, supra*, 488 U.S. 51, makes this court's decision that error was committed below an easy one with respect to the loss of the diamond bindle.

*Trombetta*'s two-pronged materiality test should not be applied here because, according to Von Villas, there is no way at this point to determine whether the diamond bindle was exculpatory or inculpatory. The prosecution should have analyzed the handwriting on the bindle before its loss to assist in this determination. Further, the *Trombetta* court found the use of the intoxilyzer (breath analysis test) was inherently reliable, whereas here there was no handwriting analysis made. Thus, Von Villas's position is more precarious than that of the defendant in *Trombetta*.

To require the prosecution to submit all seized items containing writing to handwriting analysis so that, in the event the item is inadvertently lost, either testimony relating to that which was observed on the lost item or secondary evidence thereof could be admissible, would impose an unfair burden on the prosecution. *Trombetta* does not mandate such investigation and safekeeping procedures in order for the contents of documents to be admissible, even though the original items may have been lost through inadvertence or neglect by police officials.

Von Villas makes much of language contained in the majority opinion in *Arizona* v. *Youngblood, supra*, 488 U.S. 51. In that case the Arizona Court of Appeals reversed Youngblood's conviction of child molestation, sexual assault, and kidnapping because state officials had failed to preserve semen samples from the victim's body and clothing. The high court was thus required to analyze the extent to which the due process clause of the federal Constitution requires the state to preserve evidentiary material that might be useful to a criminal defendant.

At trial, Youngblood claimed that the victim had erred in identifying him as the perpetrator, and that he was deprived of the opportunity to present expert testimony that allegedly would have exculpated him because the state failed to refrigerate items of clothing, which could have preserved samples of semen found thereon, and perhaps could have exonerated him.

Citing *Trombetta*, the high court pointed out that in both cases the officers were acting in good faith in handling the evidence; that in light of the procedures actually used, the chances that the preserved samples would have exculpated the defendants were slim;[20] that even if the samples might have shown inaccuracy in the tests, the defendants had " 'alternative means of

---

[20]Here there was considerable evidence of the guilt of the defendants on the robbery and related charges. The disguises that were used were the subject of testimony by Darlis Chefalo

demonstrating their innocence.' " (*Arizona* v. *Youngblood, supra,* 488 U.S. at p. 56 [102 L.Ed.2d at p. 288].)[21]

The *Youngblood* holding is straightforward:

"The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant *material exculpatory evidence.* But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, [citation] '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, [citation], as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases . . . in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. *We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.*" (*Arizona* v. *Youngblood, supra,* 488 U.S. at pp. 57-58 [102 L.Ed.2d at pp. 289-290], italics added.)

Von Villas's final claim is that *Youngblood* should not control disposition of this case, because in *Youngblood* the state did not attempt to make use of the materials in its own case-in-chief, whereas here secondary evidence was presented during the prosecution's case-in-chief. We conclude that such a distinction is insignificant for purposes of disposing of the issue before us.

and the Chodkowskis. Diamonds in significant quantity were found in Von Villas's briefcase in the home. Both defendants told Adams of their jewelry store heists. Both defendants kept their police Rover Radios with them on the night of the robberies—a night which they knew would find the area bereft of a patrolling officer.

[21]Von Villas did testify that he had written the notes on the bindle in question. The jury thus was allowed to consider his testimony and give to it the weight to which they deemed it was entitled. Given his failure of recollection of the specifics of the incident involving his acquisition of the bindle and the material he placed thereon, it is indeed questionable whether presentation of the original bindle may well have worked a disservice for him.

There was no *Trombetta* or *Youngblood* error.

### 5. *The Secondary Evidence of the Bindle Was Admissible*

After finding that the loss of the bindle did not violate Von Villas's rights under the due process clause of the Fourteenth Amendment, the trial judge ruled that the prosecution was entitled to present secondary evidence of the description of the bindle contained in Sergeant Risen's report, pursuant to Evidence Code sections 1271 and 1237. The loss of the bindle was without fraudulent intent, and a bona fide and diligent search was made for it.

 Von Villas claims that Evidence Code sections 1501, 1505, and 1511 preclude the use of the description of the bindle as secondary evidence. Evidence Code section 1501 provides:

"A copy of a writing is not made inadmissible by the best evidence rule if the writing is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence."

Evidence Code section 1505 provides, in part:

"If the proponent does not have in his possession or under his control a copy of a writing described in Section 1501 . . . , other secondary evidence of the content of the writing is not made inadmissible by the best evidence rule. . . ."

Evidence Code section 1511 provides:

"A duplicate is admissible to the same extent as an original unless (a) a genuine question is raised as to the authenticity of the original or (b) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

Von Villas asserts that there was a genuine question as to the authenticity of the original—was it a Northridge Mall Schaffer & Sons' bindle or was it a bindle from other sources on which he wrote certain information, as he testified at trial.

It is clear from the testimony of LAPD Sergeants Risen and Gandy that they recalled what was on the bindle. Sergeant Risen's recollection was particularly clear. There was no evidence that Sergeant Risen's property report, containing the information on the bindle, could have been tainted by other information he may have been exposed to, thus undermining the credibility of his recollection.

The trial judge's findings regarding the admissibility of the secondary evidence was amply supported by the record. Von Villas's evidence, presented to raise a genuine question regarding the authenticity of the original, was insufficient.

Finally, counsel for both Von Villas and Ford conducted extensive cross-examination of the witnesses presented by the prosecution, both on the issue of the contents of the bindle as well as its inadvertent loss by the officials. The jury thus was made well aware of the frailties inherent in the use of secondary evidence and, in particular, the fact that Von Villas was unable to conduct expert analysis of the notations on the bindle. There was no unfairness toward Von Villas in the context of Evidence Code section 1511, subdivision (b).

### 6. The Trial Judge's Refusal to Give Von Villas's Proffered Instructions Regarding the Missing Bindle

Von Villas requested that the jury be instructed as follows:

"If weaker or less satisfactory evidence is offered by a party when it is within his power to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."

The proffered defense instruction, based upon Evidence Code section 412,[22] would, it is contended, properly guide the jury in dealing with the inadvertently lost bindle.

As indicated, the bindle was lost without fraudulent intent and was the target of a very diligent search once its loss was realized. It would have been impossible for the prosecution to produce the evidence at all. Thus it was not within its power to produce the bindle. To have given the proffered instruction would have caused confusion among the jury, and would have raised issues not supported by the evidence. The trial judge's refusal to give the proffered instruction was correct. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130].)

Although Von Villas would have preferred that strong sanctions be imposed upon the prosecution because of the loss of the bindle—such as exclusion of the secondary evidence showing what was written on the bindle or the court's instructing the jury to discount the weight to be given to the

---

[22]"If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (Evid. Code, § 412.)

secondary evidence, we find that the trial judge did not commit error by refusing to so sanction or instruct. The jury was exposed to extensive testimony regarding the mishaps which occurred after the bindle was booked into evidence as well as Von Villas's testimony concerning its exculpatory value as having contained his handwriting. The jury was therefore amply aware that, although admissible as secondary evidence, the writings on the bindle should be viewed with greater suspicion than had the original bindle been presented to them.

Other proffered defense instructions would have required the jury to draw adverse inferences against the prosecution because of the inadvertent loss of the bindle in spite of the official's good faith efforts to find it. Both parties to the trial are entitled to a fair contest. Trial judges have considerable discretion in imposing sanctions, if any, if discoverable evidence is lost or destroyed. (*People* v. *Zamora* (1980) 28 Cal.3d 88, 99 [167 Cal.Rptr. 573, 615 P.2d 1361].) If there is no evidence of bad faith, the sanction imposed should be no more than is necessary to assure the defendant a fair trial. (*People* v. *Bailes* (1982) 129 Cal.App.3d 265, 272-273 [180 Cal.Rptr. 792].)

 Von Villas correctly points out that one of the instructions proffered by his counsel was identical to the instruction that was given in *Youngblood.* As approved by Justice Stevens in his concurring opinion, that instruction provided, in part:

"If you find that the State failed to preserve the evidence and that the State has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." (*Arizona* v. *Youngblood, supra,* 488 U.S. at pp. 59-60 [102 L.Ed.2d at pp. 290-291].)

Although the majority opinion in *Youngblood* did not characterize the giving of the aforementioned instruction as dispositive, Von Villas now claims that by refusing it, the trial judge violated Von Villas's due process rights.

The evidence lost in *Youngblood,* semen samples on the victim's underwear and T-shirt that became useless because the state failed to refrigerate them properly, would have, if analyzed by an expert who opined as the defendant hoped (that the semen was not his), been dispositive of the case, since the evidence would have excluded the defendant as the perpetrator. In this case, the bindle was but one of many items of evidence that the jury

reviewed before rendering its decision of guilt on the robbery and related charges.[23] *Youngblood*, therefore, is easily distinguishable from this case.

Any error that may have been committed by the trial judge in refusing Von Villas's proffered instructions regarding adverse inferences that could be drawn because of the loss of the bindle was harmless. The significant evidence supporting the jury's verdict, together with the opportunity afforded defense counsel to present evidence and argument to the effect that Von Villas's possession of the bindle was innocent rendered any failure to give the instructions harmless. (*People* v. *Lee* (1987) 43 Cal.3d 666, 677-678 [238 Cal.Rptr. 406, 738 P.2d 752]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 787 [230 Cal.Rptr. 667, 726 P.2d 113].)

E. *The Prosecutor's Directions to the Investigator to Stop Taping the Interview of Mr. Adams*

1. *Factual Background*

 Ford argues that Deputy District Attorney Jorgensen's instructions to Lieutenant Roger Fox directing him to stop tape-recording interviews with Mr. Adams constituted suppression of evidence and, therefore, reversible error. Despite the LAPD Internal Affairs Division's policy to tape all interviews, Lieutenant Fox complied with Mr. Jorgensen's wishes after consulting with his superiors. Mr. Jorgensen's reason for stopping the recording apparently was to limit the amount of information available to the defense for impeachment purposes. Mr. Jorgensen stated that he didn't want the information coming back to "haunt him." Evidence that the decision to stop taping was contrary to Internal Affairs Division's policy was admitted, but the testimony of Mr. Jorgensen regarding the motive behind the cessation was not.

Ford contends that the failure to continue to record violated his rights under the due process clause of the federal Constitution. He contends that Mr. Jorgensen's reasons for doing so were relevant under Evidence Code sections 412 and 413,[24] as they relate to the willful suppression of evidence. Ford also argues that Mr. Jorgensen, as a deputy district attorney, should

---

[23]Other evidence included, inter alia, the disguises used; the defendant's possession of loose diamonds, samples and custom made rings that were identified as having been situated in the store; the unauthorized use of police radios; and the planning of the robbery during a time when LAPD patrol officers would not be present.

[24]Evidence Code section 412 states:

"If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."

Evidence Code section 413 states:

"In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to

have been required to testify on this matter because he was a de facto party to the action.

We are not persuaded by any of these arguments.

### 2. The Due Process Claim

Ford's due process argument hinges on *Miller* v. *Vasquez* (9th Cir. 1989) 868 F.2d 1116, 1120, which held that the prosecution's failure to collect exculpatory evidence may be considered a due process violation if the prosecution acted in bad faith. (See *Arizona* v. *Youngblood, supra,* 488 U.S. 51, 58 [102 L.Ed.2d at pp. 289-290] [requiring a showing of bad faith for a failure to preserve collected evidence in order to show a due process violation]; *Brady* v. *Maryland, supra,* 373 U.S. 83, 87 [10 L.Ed.2d at pp. 218-219] [imposing a duty to disclose evidence that is material and exculpatory].) Ford characterizes Mr. Jorgensen's request to stop taping Mr. Adams's conversation as a bad faith failure to collect exclupatory evidence, and therefore a violation of his right to due process of law under *Miller*. *Miller*, however, dealt with a failure to collect physical evidence that was in existence. This is distinguishable from a failure to generate evidence through the continued use of a particular recording device. Authority cited by Ford in support of his relevancy argument clarifies this point. *In re Gary G.* (1981) 115 Cal.App.3d 629, 640 [171 Cal.Rptr. 531], points out that there is no rule requiring police to preserve investigatory notes for the defense's subsequent use as impeachment material. Citing *People* v. *Dickerson* (1969) 270 Cal.App.2d 352, 360 [75 Cal.Rptr. 828], the court commented:

"To support such a contention the defense must mean that in connection with any investigation of an alleged crime, everybody carrying on such an investigation must preserve rough notes made for the purpose of ensuring accuracy of their official reports and deliver them upon request to defense counsel in order to give possible grounds for cross-examination of such witnesses; no such rule has ever been propounded; it seems to us that it seeks to carry to a ridiculous extreme the enunciation of 'rights of accused criminals.' "

Ford's contention that the police must go beyond the preservation of notes (which was done here) and generate evidence for the purposes of impeachment via tape recording must be and is rejected.

deny by his testimony such evidence or facts in the case against him, or his willfull suppression of evidence relating thereto, if such be the case."

### 3. *Relevancy*

In addition to the claim of a due process violation, Ford argues that the reason for Mr. Jorgensen's decision to stop the taping should have been presented to the jury because its was relevant to show that evidence was improperly suppressed. He cites Evidence Code sections 412 and 413, and *Shapiro* v. *Equitable Life Assur. Soc.* (1946) 76 Cal.App.2d 75, 93 [172 P.2d 725] in support of the contention that information regarding or inferences drawn from the suppression of evidence are relevant. We agree with the rule of law enunciated in those statutes and *Shapiro*, but we cannot find that the discontinuation of the taping in this case constitutes suppression of evidence. *Shapiro*, like *Miller* v. *Vasquez, supra*, involved the failure of the prosecution to produce evidence that was in existence, not the failure to create evidence or record evidence in a certain fashion. "It is clear that the Constitution does not require the prosecution to make a complete and detailed accounting to the defendant of all police investigatory work on a case." (*People* v. *Nation* (1980) 26 Cal.3d 169, 175 [161 Cal.Rptr. 299, 604 P.2d 1051].) As the proponent of the evidence, Ford had the burden of establishing its relevancy. (Evid. Code, § 403; *People* v. *Carter* (1957) 48 Cal.2d 737 [312 P.2d 665].)

It must be noted that the trial court allowed Ford broad latitude in questioning witnesses about the taping, its termination, and the reasons for it. However, when it came to Mr. Jorgensen's statements as to why he wished to stop the taping, the trial court drew the line. Mr. Jorgensen was not a witness in the case. His personal comments regarding his reasons for terminating the taping were, in the trial court's view, irrelevant.

■ A decision to admit or exclude evidence lies within the sound discretion of the trial court. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 302 [168 Cal.Rptr. 603, 618 P.2d 149].) The ruling will not be reversed unless the probative value of the evidence clearly outweighs any probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People* v. *Haskett* (1982) 30 Cal.3d 841, 859 [180 Cal.Rptr. 640, 640 P.2d 776].) Here the court did not abuse its discretion in excluding Mr. Jorgensen's statements as to why he wished the taping stopped as irrelevant. A trial court has discretion to determine whether evidence is relevant, and that determination will not be reversed on appeal where there is no showing of an abuse of discretion. (*People* v. *Green, supra*, 27 Cal.3d 1, 19.)

■ Further, the trial court allowed significant evidence to be presented to the jury which assisted Von Villas and Ford in attacking Mr. Adams's credibility and the weight to be given to his statements made to

LAPD officers. The failure to conform to the LAPD policy of recording all interviews was discussed, as well as the termination of the taping and the reasons it was done. Counsel for Von Villas and Ford argued to the jury that the defense was intentionally precluded from obtaining impeaching material by curtailment of the taping. There was, therefore, no prejudice caused Von Villas or Ford by the trial court's ruling. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Ford contends that Mr. Jorgensen, as the prosecutor, was a de facto party to the action and therefore should have been called to testify on the matter. Ford asserts that because Government Code section 26500 allows the prosecutor to pursue cases on a discretionary basis and, therefore, act in place of the real party (the People), the prosecutor is in effect an actual party. If the prosecutor is labelled a "party," then Evidence Code sections 412 and 413 would directly affect the trial court's ruling, since the provisions expressly relate to conduct of a "party." Ford cites *People* v. *Superior Court (Aquino)* (1988) 201 Cal.App.3d 1346, 1349-1350 [248 Cal.Rptr. 50], as authority for this proposition. *Aquino*, however, provides no support.

*Aquino* merely reaffirms that venerable and long-standing principle that the district attorney represents the People of the State of California in criminal proceedings. To cite *Aquino* as authority that the district attorney is a party to this case, as opposed to the People's legal representative, is to distort *Aquino* well beyond its holding. In fact, the obvious extension of Ford's strained analysis is to characterize statements of Mr. Jorgensen as party admissions, thus making them admissible under Evidence Code section 1220. Such an extension is ill-founded and unsupported by legal authority.

F. *The Alleged Jury Misconduct*

1. *Factual Background*

Jim Burke, the foreperson of the jury, wrote the trial judge in the first week of January 1988, to discuss the case. He stated, in part:

"Our process may have been speeded and made more orderly by the following:

"Using a computer program called EXCEL, I prepared a spread sheet mapping all the counts and the possible verdict for both defendants. As soon as Rob locked us in on 4 January I distributed printed copies. These were used as secret ballots with the results tallied on the blackboard. Within two hours of starting we thus knew where we agreed and where we disagreed,

hence where we should concentrate our efforts. The ballots were then collected, torn up and burned, and that evening I purged the EXCEL disk (blank) records. From then on, we worked with the map of the case on the blackboard, keeping the jury-room curtains drawn whenever the row and column headings were present."

 Defendants claim that Mr. Burke's letter represents a sufficient showing that there was a violation of section 1137, which provides:

"Upon retiring for deliberation, the jury may take with them all papers (except depositions) which have been received as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession. They may also take with them the written instructions given, and notes of the testimony or other proceedings on the trial, taken by themselves or any of them, but none taken by any other person. The court shall provide for the custody and safekeeping of such items."

In addition, Von Villas asserts that Mr. Burke's use of the EXCEL program violates, inter alia, his and Ford's right to due process of law under the Fourteenth Amendment; their right to a fair trial by an impartial jury under the Sixth Amendment; and their right to trial by jury under article I, section 16 of the California Constitution.[25]

The trial judge was thus presented with the foreperson's letter, the motion for new trial to which it was appended, and a statement in opposition filed by the People suggesting that no improprieties had occurred with the jury and that Mr. Burke's conduct did not constitute deliberation. There was no evidence taken in connection with the juror misconduct allegation at the hearing on the motion for new trial. The motion was denied.

2. *There Was No "Otherwise Admissible Evidence" of Jury Misconduct*

There was no discussion below with respect to the admissibility, *vel non*, of Mr. Burke's letter to the trial judge. Upon seeking a new trial based on jury misconduct, the moving party must present admissible evidence that misconduct occurred. Evidence Code section 1150, subdivision (a) provides:

"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or

---

[25]Their claims under Code of Civil Procedure section 604 and section 1046a (both statutes were repealed in 1988) are general claims involving jurors' oaths and the admonition that is given at each break to the jury. Section 1122 is of the same ilk.

events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

There is no question that Mr. Burke's letter bears serious admissibility problems.

In *People* v. *Perez* (1992) 4 Cal.App.4th 893, 905-909 [6 Cal.Rptr.2d 141], the defendant moved for a new trial, claiming jury misconduct. In support of the motion, counsel for Perez stated that he had questioned "one of the jury members upon their discharge. One juror, either Mr. Daniel Carr or Mr. Burtle Vine, related to defense counsel that the jury based its decision of guilt on the fact that the defendant did not testify during the course of the defendant's trial. One of these two jurors stated that several of the jurors mentioned this fact during their deliberations." (*Id.* at p. 905.) Neither the defense nor any juror submitted a declaration or affidavit supporting counsel for Mr. Perez's assertion of jury misconduct. The trial judge, rather than requiring that counsel conform to the mandate of Evidence Code section 1150, subdivision (a) by filing "otherwise admissible evidence" stated: "[I] do not stand on the proposition that there's no declaration. I assume to be true the allegations that [the juror] has made not under oath." The trial judge continued: "I will assume for the sake of argument that all 12 jurors would say that discussion [regarding appellant's failure to testify at trial] took place." (4 Cal.App.4th at p. 906.)

In ruling that the trial judge erred in denying the motion for new trial, the court stated:

"Here, the court was asked to exercise its discretion in ruling on Perez's new trial motion. In so doing the court accepted a worst case scenario, explicitly assuming all jurors discussed Perez's failure to testify. In effect, the court envisioned the jury had explicitly or implicitly agreed to disregard the court's express instruction not to consider or discuss Perez's failure to take the witness stand. . . . Given the court's scenario that 12 jurors effectively agreed to disregard the court's express instructions, the jury declarations would have been admissible and constituted clear evidence of misconduct. . . . On remand we wish to emphasize the trial court should not assume 12 jurors actually discussed Perez's failure to testify. . . ." (4 Cal.App.4th at p. 908.)

The unsworn letter of Foreperson Burke does not constitute "otherwise admissible evidence" for purposes of showing jury misconduct pursuant to

the provisions of Evidence Code section 1150, subdivision (a). It was never characterized by the trial judge as reliable or admissible for any purpose at all. It is, in short, rank hearsay. The record is silent as to how it became appended to the motion for new trial, and it was not expressly mentioned at the time the trial judge reviewed and ruled on the motion for new trial. As such, it cannot legitimately constitute evidence of jury misconduct. The trial judge correctly denied the motion for new trial.

### 3. Even If the Burke Letter Was "Otherwise Admissible" as Evidence of Jury Misconduct, the Alleged Conduct Set Forth Therein Was Not Prejudicial to the Defendants

When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court, as indicated above, must first determine whether the affidavits supporting the motion are admissible under Evidence Code section 1150, subdivision (a). If the evidence is admissible, the court must then consider whether the facts establish misconduct. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 79-82 [137 Cal.Rptr. 863, 562 P.2d 1022].) Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 950-951 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].) A trial court has broad discretion in ruling on each of these questions, and its rulings will not be disturbed absent a clear abuse of discretion. (*People* v. *Montgomery* (1976) 61 Cal.App.3d 718, 728-729 [132 Cal.Rptr. 558].)

It is also well settled that evidence obtained by jurors from sources other than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby. (*People* v. *Wong Loung* (1911) 159 Cal. 520, 525-529 [114 P. 829].) The misconduct creates a presumption of prejudice which may be rebutted by a showing that no prejudice actually occurred. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *In re Winchester* (1960) 53 Cal.2d 528, 535 [2 Cal.Rptr. 296, 348 P.2d 904].) It may also be rebutted "by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party. . . ." (*People* v. *Miranda, supra,* 44 Cal.3d at p. 117.) Indeed, in *People* v. *Marshall, supra,* 50 Cal.3d 907 the court stated:

"The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror." (50 Cal.3d at p. 951.)

In *People* v. *Martinez* (1978) 82 Cal.App.3d 1 [147 Cal.Rptr. 208], the jury foreperson, during deliberations, brought three maps into the jury room which were not part of the evidence received during the capital murder trial. At the hearing on the motion for a mistrial and, later, the motion for a new trial, the trial judge refused to voir dire the foreperson or any other member of the jury to determine whether or not the maps were used by them during deliberations. The trial judge determined that the evidence presented during trial was consistent with that which was on the maps—consisting principally of times and distances. In ruling that the trial judge should have voir dired the jurors as to exactly how the maps were used but that failure to do so was not a fatal mistake, the Court of Appeals held:

". . . [T]hus, whether a defendant has been injured by jury misconduct in receiving evidence outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed. On the other hand, since jury misconduct is not per se reversible, if a review of the entire record demonstrates that the appellant has suffered no prejudice from the misconduct, a reversal is not compelled." (*People* v. *Martinez, supra,* 82 Cal.App.3d at p. 22.)

This court is well aware that if a presumption of prejudice has not been rebutted in a case involving jury misconduct, the "harmless error" tests for determining the prejudicial effect of an error are not applicable. (*Chapman* v. *California* (1967) 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

 Based upon Mr. Burke's hearsay statements contained in his letter of January 1988, all that was brought to the jury was a spread sheet containing the possible verdicts and findings that could be reached as to each charge and special allegations contained in the charging instrument. Such a document clearly does not relate to a crucial point to be resolved at trial, and its presentation to the jury could not have caused prejudice to the defendants.

The principal concern of courts when reviewing allegations of jury misconduct is that "new evidence" prejudicial to a party was presented to the jury outside the trial milieu. (*People* v. *Cooper* (1979) 95 Cal.App.3d 844, 853 [157 Cal.Rptr. 348].) Here there was no such "new evidence" presented.

The trial judge correctly denied the motion for new trial based upon allegations of jury misconduct. In short, there was no showing that "new

evidence" was improperly presented to the jury. Viewing the conduct of Mr. Burke in the light most favorable to the defendants—based on his unsolicited comments—his conduct in presenting the spread sheet during deliberations did not constitute the production of new evidence. (*People* v. *Cooper, supra,* 95 Cal.App.3d at pp. 853-854.) As such, no prejudice was caused the defendants by his conduct.

### G. *The Crime of False Imprisonment Is Not a Lesser Necessarily Included Offense to the Crime of Robbery*

 Von Villas, despite a lack of supporting authority or precedent, contends that he cannot lawfully be convicted of both robbery and felony false imprisonment because the latter crime should be a necessarily lesser included offense within the crime of robbery. This claim requires analysis as to when a single criminal episode may be "carved up" in order to sustain separate and distinct crimes. Essentially, Von Villas challenges the legality of multiple convictions for various facets of the same criminal episode, even though he received no punishment for the false imprisonment conviction because of the operation of section 654.[26]

 "The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense." (*People* v. *Pendleton,* (1979) 25 Cal.3d 371, 382 [158 Cal.Rptr. 343, 599 P.2d 649]; *People* v. *Benjamin* (1975) 52 Cal.App.3d 63, 71 [124 Cal.Rptr. 799].) This definition may be traced to *People* v. *Greer* (1947) 30 Cal.2d 589, 596 [184 P.2d 512], and *People* v. *Krupa* (1944) 64 Cal.App.2d 592, 598 [149 P.2d 416].

 "False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) "Personal liberty" is violated when the victim is "compelled to remain where he does not wish to remain, or to go where he does not wish to go." (*People* v. *Haney* (1977) 75 Cal.App.3d 308, 313 [142 Cal.Rptr. 186].)

Robbery, on the other hand, "is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

Von Villas asserts that every taking of personal property by the use of force or fear (robbery) involves an invasion of the personal liberty of another

---

[26]Section 654 provides:

"An Act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

(false imprisonment). By using the *Pendleton-Benjamin* test he argues that false imprisonment should be a lesser necessarily included offense of robbery, if it occurs during, and for the purposes of accomplishing the robbery. Thus, Von Villas asserts that a defendant may not lawfully be convicted of false imprisonment when he is convicted of a robbery that arose during the same criminal occurrence.

We reject this argument. Von Villas seeks to equate the right of freedom of movement or mobility with the right to retain personal belongings, merely because both liberties were defiled within the same criminal incident. The assertion that both crimes involve a violation of personal liberty ignores the specific freedoms the two crimes are designed to protect. This mistaken point of view stems from a misinterpretation of the words "personal liberty" in the statutory definition of false imprisonment. Von Villas construes "personal liberty" to denote broad freedoms that are inherent in our society as opposed to the freedom of movement or mobility. In light of *People* v. *Haney, supra*, 75 Cal.App. at page 313, which specifically states that "personal liberty" refers to the freedom of movement, Von Villas' analysis is incorrect. A robbery *can* be committed without subjecting a person to false imprisonment. As respondent argues, there is simply nothing inherent in robbery which *necessarily* requires the offense of false imprisonment to also be accomplished. Examples of such situations may include victims of "purse snatchings," or victims of "muggings" who immediately surrender their belongings, and therefore are not subject to any physical constraints.

In response, Von Villas asserts that these types of situations are invasions of personal liberty within the statutory definition of false imprisonment. This is true within a broad definition of personal liberty, but not true where "personal liberty" has been held to specifically refer to the freedom of movement or mobility. (*People* v. *Haney, supra*, 75 Cal.App.3d at p. 313.) Hence, because a robbery can occur without a violation of the freedom to stand still or be mobile, Von Villas was lawfully convicted of felony false imprisonment in counts IX, X and XI.

H. *The Trial Court's Refusal to Instruct the Jury on Specific Provisions of the Insurance Code*

Von Villas contends that the trial court's failure to instruct the jury on Insurance Code sections 281-283 and 286-287 constitutes reversible

error.[27] Von Villas asserts that he knew the Insurance Code provisions would prevent collection on Loguercio's life insurance policy, and thus he had no motive to kill her. Mr. Ossenkop, an insurance agent with whom Von Villas worked to set up the policy, testified that the policy was never valid pursuant to the Insurance Code provisions (although he and a coworker had erroneously told Von Villas it was in effect when issued). The trial court took judicial notice of the relevant provisions of the Insurance Code and read them into evidence before the jury. Counsel for Von Villas referred to the Insurance Code provision in argument to persuade the jurors that there was no motive for him to kill Ms. Loguercio.

Von Villas attempts to bolster his argument by theorizing that when the trial court read CALJIC No. 1.00,[28] the jury was directed to disregard the provisions of the Insurance Code which the trial court read into the record. He also maintains that because the code is law that relates to testimony, he was entitled to an instruction under *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281]. In short, Von Villas's view is that the failure to specifically instruct on the specific provisions of the Insurance Code combined with the giving of CALJIC No. 1.00 deprived him of an integral part of his defense, thus creating reversible error.

Von Villas's assertions lack merit. *People* v. *Carmen, supra,* 36 Cal.2d at page 773 held that instructions must be provided to the jury regarding any theory asserted by the defense no matter how implausible that theory may be. *People* v. *Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049] clarified this concept in distinguishing the right to instructions on

[27]"Every interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured, is an insurable interest." (Ins. Code, § 281.)

"An insurable interest in property may consist in:

"1. An existing interest;

"2. An inchoate interest founded on an existing interest; or,

"3. An expectancy, coupled with an existing interest in that out of which the expectancy arises." (Ins. Code, § 282.)

"A mere contingent or expectant interest in anything, not founded on an actual right to the thing, nor upon any valid contract for it, is not insurable." (Ins. Code, § 283.)

"An interest in property insured must exist when the insurance takes effect, and when the loss occurs, but need not exist in the meantime; and interest in the life or health of a person insured must exist when the insurance takes effect, but need not exist thereafter or when the loss occurs." (Ins. Code, § 286.)

"Every stipulation in a policy of insurance for the payment of loss whether the person insured has or has not any interest in the property insured, or that the policy shall be received as proof of such interest, is void." (Ins. Code, § 287.)

[28]CALJIC No. 1.00 provides in part that the jurors must disregard "anything concerning the law said by the attorneys in their arguments . . . [that] conflicts with [the judge's] instructions on the law. . . ."

defense theories with the desire for specific instructions relating to facts that support a defense theory. In his request that the Insurance Code provisions be read during the instruction phase, Von Villas confused his right to instructions on any *theory* he presented as a defense with a desire for instructions on specific elements of a defense theory. Section 1127 provides in part that "the jurors are the exclusive judges of all questions of fact submitted to them . . . [and that] [e]ither party may present to the court any written charge on the law, but not with respect to matters of fact. . . ." Although the Insurance Code is law, it was brought before the jury here as factual evidence in conjunction with Von Villas's and Mr. Ossenkop's testimony to support the defense theory of lack of motive. The jury thereafter was properly instructed on the defense theory regarding lack of motive. Von Villas's request for the Insurance Code instruction is thus improper under *People* v. *Wright, supra,* and under section 1127.

Von Villas's contention that CALJIC No. 1.00 instructed the jury to disregard the Insurance Code is also in error. As stated above, CALJIC No. 1.00 instructs the jury to disregard any law the attorneys give that *conflicts* with the law provided by the court. There is nothing in the record to indicate that the Insurance Code conflicts with the judge's instructions on motive (or any other instructions given to the jury). Furthermore, Von Villas makes no such contention. As CALJIC No. 1.00 instructs only to disregard law that is in conflict with the law given by the judge, and there is no indication that the factually presented Insurance Code provisions were in conflict with any instructions, there is no reason to believe that the jury disregarded the Insurance Code in its deliberations.

We conclude that because Insurance Code sections 281-283 and 286-287 were presented here as factual information in support of a defense theory (on which instruction was given), the court's refusal to include the Insurance Code in its instructions to the jury was proper.

I. *The Trial Court's Refusal to Instruct the Jury That It Was Required to Unanimously Agree Upon the Specific Overt Act Committed in Furtherance of Each Conspiracy*

 Von Villas and Ford aver that the trial court erred when it complied with *People* v. *Jones* (1986) 180 Cal.App.3d 509 [225 Cal.Rptr. 697], and refused to instruct the jury to unanimously agree upon the same overt acts committed in furtherance of each conspiracy before finding guilt.[29] Their argument is made by analogy to cases that require an instruction directing

---

[29]The trial court refused to instruct the jury because of the following portion of the requested instruction:

"In order to find the defendant guilty, all the jurors must agree that he committed the same overt act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict." Note that this is essentially a CALJIC No. 17.01 type instruction.

the jury to agree on the particular act underlying a conviction, when the evidence consists of more than one act upon which the conviction could be based (*People* v. *Diedrich* (1982) 31 Cal.3d 263 [182 Cal.Rptr. 354, 643 P.2d 971]; *People* v. *Moore* (1983) 143 Cal.App.3d 1059 [192 Cal.Rptr. 374]), and where disagreement among the jurors as to an act underlying a conviction is possible. (*People* v. *Diedrich, supra*, 31 Cal.3d at pp. 280-281; *People* v. *Deletto* (1983) 147 Cal.App.3d 458, 471-472 [195 Cal.Rptr. 233] [cert. den. 466 U.S. 952 (80 L.Ed.2d 542, 104 S.Ct. 2156)].) Because commission of an overt act is an essential element of conspiracy, Von Villas and Ford contend that failure to give an unanimity instruction amounts to error. (*Feagles* v. *Superior Court* (1970) 11 Cal.App.3d 735, 739 [90 Cal.Rptr. 197].) Thus they argue that the *Jones* decision was "aberrant," and consequently the trial court's reliance thereon was "misplaced."

Respondent accurately refutes this argument. *Diedrich, Moore*, and *Deletto* were cases wherein "multiple acts constituting the proscribed criminal offense, not multiple alleged overt acts of a conspiracy" were involved. An overt act of a conspiracy has been held to be part of the "theory" of the case rather than an actual element of conspiracy. (*People* v. *Jones, supra*, 180 Cal.App.3d at pp. 516-517, *People* v. *Cribas* (1991) 231 Cal.App.3d 596, 611 [282 Cal.Rptr. 538] [review den.].) The authorities cited by Von Villas and Ford entail multiple acts that are the elements of an offense, not multiple "theories" which present a criminal act to the jury. (*People* v. *Diedrich, supra*, [multiple acts of bribery]; *People* v. *Moore, supra*, [multiple acts of oral copulation]; *People* v. *Deletto, supra*, [multiple acts of "drive by" shootings].) This distinction is significant because it is not necessary to require the jury to agree on one or more of the several theories presented by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of the offense. This rule has been applied in burglary and murder cases. (*People* v. *Failla* (1966) 64 Cal.2d 560, 567 [51 Cal.Rptr. 103, 414 P.2d 39] [theft]; *People* v. *Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897] [murder]; *People* v. *Chavez* (1951) 37 Cal.2d 656, 670-672 [234 P.2d 632] [murder]; *People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956] [murder].) Hence, the assertion that *Jones* is an "aberrant" decision is incorrect because appellant fails to recognize the distinction between an overt act as part of the "theory" of the crime rather than as an act that constitutes a crime.

In *Jones*, the court specifically held that an unanimity instruction in regard to overt acts was not required:

"Inasmuch as the overt act . . . is not an actual element of the crime, it follows that the jury need only be unanimous in finding an overt act was done in furtherance of the conspiracy, not in finding a particular overt act was done.

. . . Hence, the overt act is part of the 'theory' of the case, not an act constituting the offense." Thus, "a trial court need not instruct the jury [*sic*] they must unanimously agree as to the overt act done in pursuance of a conspiracy." (*Jones, supra*, 180 Cal.App.3d at pp. 516-517; *People v. Cribas, supra*, 231 Cal.App.3d 596, 611.)

Other cases, while differing with the appellant's rationale, have maintained (in dicta) that a specific, separate unanimity instruction must be submitted to the jury. (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 611-613 [233 Cal.Rptr. 645]; *People v. Brown* (1991) 226 Cal.App.3d 1361, 1369 [277 Cal.Rptr. 309].) The *Ramirez* and *Brown* opinions are based upon the ruling that an overt act is an essential element of a conspiracy (*Feagles v. Superior court, supra*, 11 Cal.App.3d at p. 739), and thus jury unanimity must be assured.

This view fails to recognize the distinction espoused by *People v. Jones, supra*: an overt act is an essential element in that it is the theory which proves a criminal conspiracy, rather than an element in the actual crime of conspiracy. Further, *Ramirez* and *Brown* fail to credit or refute the reasoning behind the *Jones* conclusion. *Jones* states that evaluating an overt act as part of the "theory of a case" is "logical in light of the stated purposes for requiring an overt act: allowing termination of the agreement to avoid punishment and requiring proof of an intent to act on the evil thoughts of the conspirators." Therefore, "the overt act merely establishes the legal existence of a criminal conspiracy," and thus it is " 'the agreement, not the overt act that is punishable.' " (*People v. Jones, supra*, 180 Cal.App.3d at p. 516.)

Respondent also argues that because the jury was instructed in the language of CALJIC No. 6.10 in conjunction with CALJIC No. 17.50, unanimity is assured regardless of a specific instruction. CALJIC No. 6.10 states that proof of a conspiracy requires proof of at least one of the alleged overt acts in furtherance of the accomplishment of the object of the conspiracy. CALJIC No. 17.50 provides that "[i]n order to reach a verdict, all twelve jurors must agree to a decision and to any findings that [they] have been instructed to put into [their] verdict."

In *People v. Skelton* (1980) 109 Cal.App.3d 691, 715-717 [167 Cal.Rptr. 636] cert. den. 450 U.S. 917 [67 L.Ed.2d 343, 101 S.Ct. 1361]), the court

expressly held that the combination of CALJIC Nos. 6.10 and 17.50 adequately assures jury unanimity on the overt act underlying a conspiracy conviction. (See also, *United States* v. *Armone* (2d Cir. 1966) 363 F.2d 385, 398 [cert. den. 385 U.S. 957 (17 L.Ed.2d 303, 87 S.Ct. 392)].) Although, several cases which refuse to assume that the jury will infer the specific unanimity requirement from other instructions (*People* v. *Ramirez, supra,* 189 Cal.App.3d 603, 613; *People* v. *Moore, supra,* 143 Cal.App.3d 1059, 1066; *People* v. *Crawford* (1982) 131 Cal.App.3d 591, 595-596 [182 Cal.Rptr. 536]), *Skelton* still applies to an act which constitutes a criminal offense. However, the rationale espoused by *Skelton* is irrelevant because, as discussed above, there is no requirement of jury unanimity on an overt act of a criminal conspiracy.

Lastly, at the time the trial court decided to rely on *Jones* it was bound to follow the Court of Appeal decision. ■■■ "Under the doctrine of *stare decisis,* all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction." (*Auto Equity Sales* v. *Superior Court, supra,* 57 Cal.2d 450, 455.) Therefore, the trial court's reliance on *Jones* was not "misplaced," as the appellant contends, but was in fact mandated. Accordingly, there was no error.

## J. *Von Villas's Statements Concerning Proposed Criminal Activity*

### 1. *Factual Background*

The trial court allowed into evidence certain statements Von Villas made to four women which reflected his desire to commit certain criminal acts for profit.The jury was instructed that the statements could only be considered admissible as to Von Villas, and not Ford; and that they were admitted only to prove intent or motive on his part, not that Von Villas had a propensity to act in conformity with the statements.

Ms. Loguercio's prior testimony was read wherein she stated that Von Villas had once offered to have a third person kill her husband for her. Ms. Gayl West testified that Von Villas had told her that if she knew anyone who wanted a contract put on anybody, she should let him know, so they could both make a commission. Ms. Joyce Reynolds testified that Von Villas told her that he was tired of being an honest cop and that there was no job he would not do for money, including murder. Finally, Ms. Marilyn Petretti testified that Von Villas had told her that he could have people killed and that she overheard him on the telephone stating, "We'll shoot out the lights."

### 2. *Discussion*

■■■ Von Villas claims that admission of these statements constitutes admission of character evidence in violation of Evidence Code section 1102

because the statements were submitted to the jury during the prosecution case-in-chief, and not by the prosecution to rebut evidence adduced by Von Villas as to his character or a trait of his character.[30] Von Villas further asserts that the statements are not admissible under Evidence Code section 1101, subdivision (a), which provides that evidence of a person's character or a trait of his character is inadmissible when offered to prove his conduct on a specified occasion.

Respondent counters the Von Villas argument by characterizing the statements as ". . . evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact [such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .] other than his or her disposition to commit such an act" (Evid. Code, § 1101, subd. (b)), thus making them relevant and admissible.

There is no question that Evidence Code section 1101, subdivision (a) precludes admission into evidence of prior bad acts, etc., if the inference sought to be established is that the actor, because of the prior bad acts, had the propensity to commit criminal acts in general, or of a particular class. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883].) The question presented is whether the statements of Von Villas qualify as Evidence Code section 1101, subdivision (b) "crime, civil wrong, or other act" evidence, and, if so, whether such evidence was admitted for a proper purpose—in this case to show motive or intent as to the offenses Von Villas faced in the instant prosecution. Our response to the question is that the statements constitute admissions under Evidence Code section 1220; admissions pertaining to crimes, civil wrongs or other acts as enunciated in Evidence Code section 1101, subdivision (b), and that they were, in part, admitted to show the motive or intent of Von Villas in connection with the charged offenses.

We start with the proposition that "(a) trial court is vested with wide discretion in deciding the relevancy of evidence. . . . Further, it is the exclusive province of the trial court to determine whether the probative value of the evidence outweighs its prejudicial effect. . . . On appeal, the court's discretion will not be disturbed absent a clear showing of abuse." (*People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 402 [226 Cal.Rptr.

---

[30]"In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is:

"(a) Offered by the defendant to prove his conduct in conformity with such character or trait of character.

"(b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (Evid. Code, § 1102.)

880].) ■■■ The trial court's ruling that, with appropriate limiting instruction as to the use the jury could make of the statements,[31] they were admissible only as to Von Villas and not Ford, was reasonable. There was no abuse of discretion.

Although the statements of the witnesses principally related to Von Villas's motive or intent to commit murders for hire, Ms. Reynolds did point out that he at one point said he would do any job for money, including murder. One might conclude, as Von Villas asserts, that even if the statements were found to be relevant and admissible under Evidence Code section 1101, subdivision (b) with respect to the conspiracy and attempted murder charges, they would be inadmissible to show motive or intent as to the jewelry store robbery and related charges. His statement to Ms. Reynolds would appear to be admissible Evidence Code section 1101, subdivision (b) evidence as to both the attempted murder and related charges as well as the robbery and related charges. We conclude, however, that the trial court erred in allowing the Von Villas statements wherein he admitted that he intended or had the motive to commit or arrange for others to commit murder to be considered by the jury as to the robbery and related charges.

Von Villas denied any participation in the robbery and related charges, therefore the issue of his intent was not relevant. Identification was the key issue, and the statements of the witnesses did not refer to that issue. (*People v. Willoughby* (1985) 164 Cal.App.3d 1054, 1063-1064 [210 Cal.Rptr. 880].) In light of the substantial evidence amassed by the prosecution against Von Villas in proving the robbery and related charges, the error is harmless. Error of this nature results in a miscarriage of justice and is thus reversible error when the court is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in absence of the error. (Cal. Const., art. VI, § 13; *People v. Watson, supra*, 46 Cal.2d 818, 836.) We find no such error occurred.

Von Villas asserts that *Willoughby, supra*, calls for reversal based on error similar to that which was committed here. We disagree. In *Willoughby* the erroneously admitted testimony caused obvious prejudice to the defendant because it was the focal point of the prosecution's case. Here the evidence of Von Villas's guilt as to the robbery and related charges was substantial. The jury considered identification evidence, including the wigs and makeup used

---

[31]"You are instructed that the evidence of such statements is relevant only to the issue of intent to commit the crimes charged, and you are not to consider it for any other purpose. You must not consider the statements made, if any as evidence of bad character or disposition to commit any crime. If you find that the evidence of such statements does not apply to defendant Von Villas' intent or other required mental state to commit the crimes charged, you must totally disregard this evidence."

by Von Villas; evidence of multiple sales of loose diamonds by him after the robbery; his possession of certain items, including brass rings and diamond bindles, that the jury reasonably could have concluded came from the store in which the robbery occurred; and Von Villas's admissions to Mr. Adams that he, in fact, committed the jewelry store robbery. Surely, the erroneous admission of the statements in question was harmless error at most.

■■■■ Von Villas, in his reply brief, raises an objection to the trial court's ruling admitting into evidence certain facts that could have allowed the jury to reasonably infer that he, Ford and Mr. Adams were involved in gunrunning activities. The record does not reflect that he objected to introduction of this evidence at trial. Failure to object at trial results in a waiver of the right to raise the issue on appeal. (Evid. Code, § 353; *People v. Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330].) The record does reflect that both Von Villas and Ford attempted to discredit Mr. Adams, a key prosecution witness, with the gunrunning evidence and certain inconsistencies in his testimony relevant thereto. We find that the trial court did not abuse its discretion in allowing the gunrunning evidence to be presented. Any error made in connection with its admission was harmless.

■■■■ We find that the statements of the witnesses constituted admissions of Von Villas pursuant to Evidence Code section 1220 that were indeed relevant to the charges of conspiracy and attempted murder. Even if, arguendo, it were determined that the trial court misapplied Evidence Code section 1101, subdivision (b) in allowing the statements in as prior crimes, civil wrongs or acts to show motive or intent, they certainly were admissible under the alternative legal theory which allows for the admission of party admissions. (Evid. Code, § 1220; *People v. Lang* (1989) 49 Cal.3d 991, 1013-1014 [264 Cal.Rptr. 386, 782 P.2d 627]; *People v. Rodriguez, supra,* 42 Cal.3d 730, 756-757.)

K. *The Trial Court's Refusal to Admit Extrinsic Evidence of Third Party Culpability*

■■■■ Ford contends that the trial court committed prejudicial error by excluding his proffered evidence of third party culpability in connection with the Schaffer & Sons robbery. ■■■■ A criminal defendant has the right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his or her own guilt. (*People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].) This rule, however, does not require the trial judge to admit all evidence which tends to show a third party's possible culpability. "Evidence of mere motive or opportunity to commit the crime [by] another person, without more, will not suffice to raise

a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*; *People* v. *Kegler* (1987) 197 Cal.App.3d 72, 80 [242 Cal.Rptr. 897] [review den].) Once a defendant's evidence has been found to raise a reasonable doubt it may still be excluded "when the court properly exercises its discretion under Evidence Code section 352 to reject evidence that creates a substantial danger of undue consumption of time or prejudicing, confusing, or misleading the jury." (*People* v. *Hall*, *supra*, 41 Cal.3d at p. 829; see Evid. Code § 352.) Thus, "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible (§ 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion. (§ 352.)" (41 Cal.3d at p. 834.)

A court's inquiry into the admissibility of third party culpability will always turn on the facts of the case. Accordingly, the trial court must be cautious not to invade the province of the jury by making credibility determinations about the proffered evidence. (41 Cal.3d at p. 834.)

 Ford claims that numerous facts about the time, place, and description of another robbery created a reasonable doubt about his guilt. On November 19, 1982, three days before the Schaffer & Sons robbery, Houston Jewelers was robbed. Houston Jewelers and Schaffer & Sons are both located in the San Fernando Valley. The Chodkowskis' (the mother and daughter who witnessed the Schaffer & Sons robbery) descriptions of the Schaffer perpetrators were vaguely similar to the eyewitness descriptions of the Houston robbery perpetrators. Based on these purported similarities, the defense requested that witnesses of the Houston robbery be allowed to testify that the descriptions of the suspects in the Schaffer & Sons robbery matched their description of the suspects in the Houston store robbery. The defense argued that this testimony would create a reasonable doubt by allowing the jury to draw the inference that both crimes were carried out by the same suspects, especially because Ford had an alibi when the Houston robbery took place. The trial court, not persuaded that these correlations created a reasonable doubt, refused to admit the testimony.

On appeal, Ford asserts that the proffered evidence concerning the Houston robbery witnesses would have, in fact, raised a reasonable doubt as to his guilt. Hence, Ford contends that the trial court's decision to exclude the evidence was an improper incursion into the jury's function, and that it constitutes reversible error.

We believe that the totality of the Houston robbery evidence did not rise to the level necessary to create a reasonable doubt in regard to Ford's or Von

Villas's guilt and that the trial court's decision to exclude it was reasonable. First, the affinity between the Schaffer & Sons and Houston robberies is at best questionable. We find no direct or circumstantial evidence linking the suspects in the Houston robbery to the perpetrators of the Schaffer & Sons robbery. Out of all the circumstantial evidence that purportedly renders the crimes similar, only two items are unchallenged: the fact that both robberies shared the same general location (the San Fernando Valley) and that both stores were jewelry stores. Other circumstantial evidence such as the description of the suspects in the Houston robbery, the modus operandi used, and the type of property taken is either only vaguely similar or completely inconsistent with the Schaffer & Sons robbery.

Although there was some similarity among the descriptions of the bandits in both robberies, substantial differences exist between the two crimes. The description of the Houston robbery depicts an unprepared and disorganized theft. The Houston robbery occurred in the early afternoon, during business hours, thus involving an uncontrolled interruption by a customer. The culprits relied on store employees to open safes and display cases, while ordering others to lie face-down on the floor. In this atmosphere of general confusion, a store employee obtained a gun and shot at the suspects while chasing them to their getaway car.

In contrast, the Schaffer & Sons robbery was carefully planned and performed. In executing the Schaffer & Sons robbery, one suspect entered the store at closing time and immediately immobilized the store employees. Another suspect "closed" the store and belayed the suspicions of the mall security guards. The suspects entered at a time when the safe and display cases were open and the number of witnesses was at a minimum. Thus, the methods of the suspects of the two robberies were entirely dissimilar, in that Schaffer & Sons was thoroughly organized while Houston was apparently a haphazard affair.

A final distinguishing characteristic between the two robberies is the type of property taken. In the Houston robbery the property taken consisted of actual pieces of jewelry. In the Schaffer & Sons robbery the majority of the property taken was loose diamonds.

These are broad and objective distinctions between the two crimes. The tenuous pieces of evidence that purportedly link both robberies do not meet the standard of reasonable doubt set forth in *People* v. *Hall, supra*. There must be direct or circumstantial evidence which links a third person to the actual perpetration of the crime. If the descriptions of the perpetrators had not varied from one group of witnesses to the next, or were more comparable, a link may have been established. There is no link in this case. We are

not persuaded that the evidence of the Houston robbery raises a reasonable doubt as to Ford's or Von Villas's guilt. The evidence was properly excluded.

### L. *The Trial Court's Ruling Excluding Evidence of Details of Mr. Adams's Arrests While in the Witness Protection Program*

After Mr. Adams entered the witness protection program, he was arrested in Stanton for writing a bad check and in Oxnard for auto theft and embezzlement. He was never prosecuted on those charges. Ford wished to impeach Mr. Adams and LAPD Officers Gailey and Fox with details of the arrests. As to the officers, Ford asserts that the proffered evidence would have rebutted claims that Mr. Adams received no special treatment. The trial court allowed information into evidence which showed that Mr. Adams had received favorable treatment by not being prosecuted after his arrests, but disallowed any specific reference to the precise charges against him. The court determined that such references were barred by Evidence Code section 787.[32] According to the trial court, any such references would constitute improper impeachment by use of specific acts of conduct.

Evidence of special treatment of Mr. Adams on the part of law enforcement officials (including statements made by Mr. Adams wherein he asserted that he was above the law by virtue of his "star witness" status) was deemed admissible to show his state of mind. (Evid. Code, § 780, subd. (f).) According to the trial court, the jury was entitled to be made aware of any information concerning actual benefits Mr. Adams received or benefits he believed he enjoyed by virtue of his being a witness in the case.

Ford asserts that the exclusion of evidence detailing the specific crimes of which Adams was accused constitutes reversible error. We disagree.

Ford argues that the trial court erroneously excluded the proffered evidence through operation of Evidence Code section 787, since that provision was abrogated by article I, section 28, subdivision (d) of the California Constitution (Prop. 8). (*People v. Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619].) No argument is presented on appeal to support the conclusion that *Harris* must be applied retroactively to the instant case, nor was the argument that Ford should have been permitted to impeach Mr. Adams by proof of prior bad acts in spite of Evidence Code section 787 raised at trial. As such, Ford's failure to raise the issue at trial constitutes a

---

[32]"Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness." (Evid. Code, § 787.)

waiver of his right to raise the issue on appeal. (Evid. Code, § 354; *People* v. *Benson, supra,* 52 Cal.3d 754, 788.)

Nonetheless we shall consider the merits of Ford's claim.

Even if we concluded that the trial court's ruling excluding the details of the charges against Mr. Adams in Stanton and Oxnard pursuant to Evidence Code section 787 was erroneous, that alone would not conclude our inquiry.

Article I, section 28, subdivision (d) of the California Constitution provides, in part, that "[n]othing in this section shall affect any existing statutory rule of evidence relating to . . . Evidence Code, sections 352 . . . ." Evidence Code section 352, of course, provides that the trial court may exclude evidence when its probative value is substantially outweighed by its prejudicial effect. That provision thus provides the trial court with considerable control over the admissibility of evidence, no matter how relevant it may be.

In passing upon the admissibility, *vel non,* of the details of the unprosecuted charges against Mr. Adams, the trial court found, on balance, that those details, even if relevant to the credibility of Mr. Adams, would only cause undue confusion and clouding of the issues. There was adequate evidence before the jury from which they could determine whether or not Mr. Adams's testimony was influenced by special treatment from law enforcement officers, including the reasonable conclusion that could have been reached that the charges were, in fact, dismissed because of his value as a witness. To allow the defense to delve into the specific details of the charges in Stanton and Oxnard would also cause an inevitable time-consuming and confusing determination of the veracity of the charges. In effect, Mr. Adams would become a party to a minitrial of the unprosecuted charges.

The decision whether to admit or exclude evidence, of course, lies within the sound discretion of the trial court. (*People* v. *Jackson, supra,* 28 Cal.3d 264, 302.) Such a decision will not be reversed unless the probative value clearly outweighs any probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues or of misleading the jury. (Evid. Code, § 352; *People* v. *Haskett* (1982) 30 Cal.3d 841, 859 [180 Cal.Rptr. 640, 640 P.2d 776].)

Although the trial court may have committed error in its analysis of Evidence Code section 787 in light of *Harris, supra,* 47 Cal.3d 1047, it was within that court's discretion to determine, through operation of Evidence Code section 352, whether the evidence of the details of the unprosecuted charges against Mr. Adams should be admitted. The trial court's decision to

exclude the evidence was well within its discretion. Any possible error was clearly harmless. (*People* v. *Watson*, *supra*, 46 Cal.2d 818, 836.)

M. *The Trial Court's Decision to Exclude Evidence Proffered by Ford Concerning Details of His Wife's Rape, the Recorded Conversation of Dinner Discussions Between Mr. Adams and Ms. Loguercio and Portions of a Tape Recording of a Conversation Between Mr. Adams and Ford*

1. *Factual Background*

Ford contends the trial court deprived him of his right to due process of law by excluding three pieces of evidence necessary for his defense. The jury was precluded from considering the following evidence: details of Ford's wife's rape in November 1980; a recorded dinner conversation between Mr. Adams and Ms. Loguercio made on July 6, 1983; and references to Von Villas made in a recorded conversation between Mr. Adams and Ford while the two were driving in a van on July 7, 1983, as they were preparing to murder Ms. Loguercio.

Details of the rape were excluded because the trial court found that the danger of prejudice to either party outweighed any possible probative value. Ford, however, was allowed to present evidence that the brutal rape occurred, that he and his wife suffered substantial psychological difficulties as a result thereof, and that he had ordered a wig to facilitate his search for the rapist. The recorded conversation between Mr. Adams and Ms. Loguercio was excluded because the many references to Von Villas made by Ms. Loguercio therein were ruled to be inadmissible hearsay. In cross-examining Mr. Adams, Ford was allowed to make use of those portions of the transcript that did not refer to Von Villas in order to refresh Mr. Adams's memory of what was said during the conversation. References to Von Villas on the van tape were excluded because they constituted admissions by Ford which incriminated codefendant Von Villas.

2. *The Details Concerning the November 1980 Rape of Ford's Wife*

Ford contends that the trial judge's decision to exclude the details of his wife's rape constituted an abuse of discretion. Because other evidence concerning the rape was admitted, the trial court deemed the specific details of the rape cumulative and prejudicial. We find that the trial court's order excluding such evidence was well within its discretion.

Ford offered two reasons in support of his contention that details of the rape were admissible: first, to demonstrate that Ford purchased a wig to

facilitate the search for his wife's attacker (to counter the assertion that the wig was used in the jewelry store robbery), and, second, to show that the brutality of his wife's rape rendered Ford incapable of attempting to kill Ms. Loguercio while engaged in sexual intercourse.

The trial court may exclude evidence if its probative value is outweighed by its potential for prejudicial effect, when its introduction might lead to confusion of the issues, or when its introduction may cause undue consumption of time. (Evid. Code, § 352.) The court allowed the jury to learn of the brutal rape and its adverse psychological effect on Ford. This allowed Ford to offer an alternative reason for purchasing the wig and offered support to his contention that he could not have committed a brutal sexual assault after his wife had been similarly victimized. We fail to see how precise details of the rape, as horrible as they may have been, would have supported his assertions in this regard.[33]

The assertion that details of the rape would have bolstered Ford's argument is highly speculative. The evidence was thus properly excluded. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684 [248 Cal.Rptr. 69, 755 P.2d 253].)

Furthermore, the excluded rape evidence is highly prejudicial. The details of the rape might have engendered a sympathy among the jury for Ford that would have had no bearing on his culpability for the charged crimes. (*People v. Wright* (1985) 39 Cal.3d 576, 585 [217 Cal.Rptr. 212, 703 P.2d 1106].) In addition, as noted by the trial court, the prosecution was prepared to present an expert witness to support the assertion that Ford was more likely to engage in sexual assault after being so victimized, in order to exact some twisted means of revenge. This line of testimony would have obviously confused the issues and been unduly time consuming. As the details of the rape would have been highly prejudicial, with little, if any, probative value, the trial court was within its discretion in excluding evidence thereof.

3. *Exclusion of the Tape of the Dinner Conversation Between Mr. Adams and Ms. Loguercio on July 6, 1983*

Ford contends that the trial court's refusal to allow him to play a tape of a dinner conversation between Mr. Adams and Ms. Loguercio constituted an abuse of discretion. He also argues that because the tape was mentioned during the direct examination of Mr. Adams, the entire tape was admissible upon his cross-examination. We agree with the trial court's ruling that the probative value of the tape as to Ford was far outweighed by the prejudicial effect the tape would have had as to Von Villas. Further, we

---

[33]Ford's wife was raped, sodomized and subjected to rape with a foreign object.

disagree with Ford's assertion that a reference to the tape on direct examination necessitated the introduction into evidence of the entire tape on cross-examination.

Ford asserts that the tape demonstrates that Mr. Adams's level of knowledge about the murder plan was sufficient to support the conclusion that he, Mr. Adams, initiated the plan. He also argues that the tone of the conversation, discernible only upon hearing the full contents of the tape, discredits Mr. Adams's and Ms. Loguercio's claims that she feared for her life during the dinner.

A review of the omitted portions of the tape does not support these assertions. Clearly, portions of the tape reflect that Ms. Loguercio and Mr. Adams were, at times, joking with one another. Ford contends that this alone demonstrates that Ms. Loguercio did not fear for her life. There are other portions of the tape, however, in which Ms. Loguercio's level of anxiety apparently brings her to tears. In addition, she verbalizes this fear throughout the tape: "I'm sure they've had this planned. They tried to do me away the other . . . night. . . ." The content of the tape clearly demonstrates she harbored fear for her life in spite of the moments of apparently humorous discourse.

Exclusion of the tape itself did not preclude Ford from examining Mr. Adams's knowledge of the plan to kill Ms. Loguercio. Ford was permitted to use the transcript of the July 6, 1983, tape in cross-examining Mr. Adams. He was thus able to elicit any knowledge Mr. Adams may have held by confronting him with statements made during the conversation.

Admission of the tape also would have been extremely prejudicial to Von Villas. Ms. Loguercio's statements wherein she alleged that Von Villas was trying to kill her were prejudicial hearsay because Ms. Loguercio, having died before trial, was not available to testify. (Evid. Code, § 1200.)

The contents of the tape have minimal probative value as to Ford. Admission of the tape would have caused great prejudice to Von Villas. The trial court properly excluded the evidence. (Evid. Code, § 352; *Terry* v. *Coleman* (1985) 38 Cal.3d 69, 91 [211 Cal.Rptr. 102, 695 P.2d 189].)

Ford further contends that under Evidence Code section 356 and *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1174 [259 Cal.Rptr. 701, 774 P.2d 730], the

entire tape was admissible because the prosecution placed a portion of the tape into evidence on direct examination of Mr. Adams.[34]

Ford argues that *Hamilton, supra,* does not require the defense to show that a partially introduced recorded document or statement is relevant before it can be used during cross-examination. Ford's analysis is incorrect. *Hamilton* did not state that there is no requirement for a showing of relevancy; rather, the court pointed out that the requirement for relevancy will not be narrowly construed. Further, such evidence may be excluded at the court's discretion if it does not serve to clarify or explain that which was admitted on direct testimony, or if the proponent of the evidence will not be seriously prejudiced by its exclusion. (*Witt v. Jackson* (1961) 57 Cal.2d 57, 67 [17 Cal.Rptr. 369, 366 P.2d 641]; *Berg v. Sonen* (1964) 230 Cal.App.2d 434, 440-441 [41 Cal.Rptr. 37].) In *People v. Webb* (1956) 143 Cal.App.2d 402, 418 [300 P.2d 130], the court held that the defense was not allowed to submit the entire transcript of a taped conversation into evidence after a portion of the tape had been admitted into evidence on motion of the prosecution, unless it could be shown that the evidence proffered by the defense was relevant.

Here, Ford had access to a transcript of and the tape in question. As the proponent of the evidence, he held the burden of proving its relevance. (*People v. Carter, supra,* 48 Cal.2d 737.) The record is barren of any showing by Ford that the entire tape is relevant in any way to that portion of the tape offered by the prosecution. We thus conclude that the evidence was properly excluded under Evidence Code sections 356 and 352. The trial court did not abuse its discretion by disallowing the use of the entire July 6, 1983, tape during the cross-examination of Mr. Adams.

4. *Exclusion of References to Von Villas on the Tape of Mr. Adams's and Ford's Van Conversation of July 7, 1983*

Ford contends that exclusion of references to Von Villas from the van tape of July 7, 1983, was error. The trial court excluded the references in order to protect Von Villas from being prejudiced by the admission of a codefendant's admission or statement implicating him. Ford argues that the remedy for curing this problem was not exclusion of the evidence, but rather

---

[34]"Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.)

the impanelling of separate juries, trying the defendant's separately, or offering a limiting instruction as to appropriate use of the evidence by the jurors. Ford grounds these suggested remedies on the alleged value the excluded evidence would have provided his defense. He claims the references to Von Villas on the tape would have shown that his dislike of Von Villas was substantial enough to preclude any willingness on Ford's part to conspire with him, and that the exclusion created a distorted emphasis on Ford's participation in the murder attempt.

In our view, Ford exaggerates the value of the excluded evidence to his defense. The trial court correctly excluded Ford's statements or admissions on the tape that may have incriminated Von Villas. (*People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].)

His claim that the excluded portions of the tape show that he could not have conspired with Von Villas because he strongly disliked him lacks merit. If anything, the statements tend to show that Ford was willing to conspire in spite of his apparent dislike for Von Villas.[35]

The contention that removal of references to Von Villas on the tape places a distorted emphasis on Ford is equally unpersuasive. In short, the evidence of Ford's complicity in the attempted murder of Ms. Loguercio was overwhelming. Had the jury been allowed to hear those portions of the tape in which Ford discusses Von Villas, they would have been exposed to additional inculpatory material as to Ford. We are of the opinion that the portions of the tape excluded by the trial court were not beneficial to Ford's defense. In any event, the court properly excluded the portions of the tape in question.

In *People* v. *Aranda, supra,* 63 Cal.2d 518, 530-531, the Supreme Court held:

"When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court

---

[35]"Bob is a partner and you're a partner. I get along with Bob, I tolerate Bob, but I don't particularly like the mother fucker. Okay.

"He's (Bob) a good con man. He's a good bullshit artist. I think he'll hold up his weight when the pressure's down, but I'm really nervous about my back. You know, if the shit hits the fan I've gotta have a right hand. Somebody that's not afraid to zip a fuckin' magazine up someone's ass."

"Bob is good for talking, he's a good business man, a good organizer, but I need a fuckin' third man I can deal with too. As long as you're commin on this that's going to make us tight. We're going to be fuckin co-conspirators and fuckin' murderers."

must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. . . ."

The court further held that the procedures to be followed in deleting portions of statements cannot be fully delineated. The primary consideration is whether prejudice would be caused the declarant if the statements were not admitted into evidence. (63 Cal.2d at p. 530, fn. 10.)

Evidence Code section 1223, the provision which authorizes admissions of coconspirators as an exception to the rule against hearsay,[36] represents an exception to the *Aranda* restrictions. (*People v. Brawley* (1969) 1 Cal.3d 277, 286 [82 Cal.Rptr. 161, 461 P.2d 361]; *People v. Morales* (1968) 263 Cal.App.2d 368, 374 [69 Cal.Rptr. 402].)

As stated, the trial court correctly followed the mandate of *Aranda* by excluding the references to Von Villas found in the July 7, 1983, conversation between Ford and Mr. Adams. As to whether those references should have been admitted under the theory that they constituted admissions of a coconspirator under Evidence Code section 1223, the trial court again was required to balance the prejudicial impact of such references against any probative value they might offer. (Evid. Code, § 352.) Here, again, the trial court correctly excluded the references to Von Villas. As we have indicated, exclusion of the references caused no prejudice to Ford. Their admission into evidence necessarily would have caused prejudice to Von Villas.

In any event, any error that the trial court may have arguably committed in excluding the references to Von Villas in the July 7, 1983, conversation was harmless at best. (*People v. Watson, supra,* 46 Cal.2d 818, 836.)

### 5. *Conclusion*

The trial court properly excluded the details of Ford's wife's November, 1980 rape, the tape-recorded conversation of the dinner conversation of July

---

[36]"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence." (Evid. Code, § 1223.)

6, 1983, between Mr. Adams and Ms. Loguercio, and the references to Von Villas in the van tape of the July 7, 1983, conversation between Ford and Mr. Adams.

## IV

### DISPOSITION

The judgments are affirmed.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied November 5, 1992, and appellants' petition for review by the Supreme Court was denied January 14, 1993. George, J., did not participate therein.